CITY OF ENGLEWOOD, APPELLANT, *v.* WAGONER ET AL., APPELLEES.

(No. CA 10239—Decided November 19, 1987.)

John B. Huber, for appellant.
Stephen E. Klein, for appellees.

WOLFF, J. This is an eminent domain case. The city of Englewood (hereinafter "city") appeals the jury award of compensation to Carl and Hazel Wagoner. We affirm for the reasons that follow.

The Wagoners own property on the east side of Union Road in the city of Englewood. The property consisted of a 2.3-acre tract with three major structures, to wit: a brick single-family residence, a frame barn, and a frame commercial building. It is only this commercial building, a shoe store that fronts on Union Road, that is the focus of this proceeding.

The city needed an additional right-of-way in order to expand Union Road from two lanes to four lanes. The highway easement which existed at the date of take (stipulated to be October 15, 1985) was 24.75 feet. This highway easement was expanded by the taking of approximately twenty-five feet of additional right-of-way along the entire frontage of the 2.3 acre tract. The total amount of land appropriated for highway purposes was 0.10 acre. A further temporary easement of .058 acre was also needed for construction purposes. The final result of the improvement was the expansion of Union Road from two to four lanes, the construction of curb and gutter, and the addition of both a sidewalk and a separate bikeway.

In anticipation of the need for the additional right-of-way, the city secured a contractual right of entry agreement from the Wagoners on or about March 14, 1985. Construction began on or about October 15, 1985. As the parties were unable to reach a final agreement and settlement arising from the acquisition, the city filed its complaint for appropriation and declaration of intention to take possession on February 14, 1986. A jury trial commenced on November 3, 1986, and concluded with the return of the jury's verdict on November 10, 1986.

The city presented valuation evidence through the testimony of its fee appraiser, Henry Halas, as follows:

| | |
|---|---|
| Land Taken | $ 7,850 |
| Land Improvements Taken | 2,100 |
| Damages to Residue | 22,550 |
| Temporary Easement | 300 |
| Total Compensation | $32,800 |

The property owners presented valuation evidence, through fee appraiser Paul Saladin, as follows:

| | |
|---|---|
| Land Taken | $ 9,000 |
| Damages to Residue by virtue of cost to cure | 46,550 |
| Temporary Easement | 350 |
| Total Compensation | $55,900 |

The jury awarded compensation in the following manner:

| | |
|---|---|
| Land and Land Improvements Taken | $ 9,400 |
| Damages to Residue | 49,088 |
| Temporary Easement | 350 |
| Total Compensation | $58,838 |

The court entered its judgment entry on the verdict on December 5, 1986. The city asserts the following assignments of error on this appeal:

"1. The trial court in error allowed into evidence proof of the owners' special assessment debt which arose from this highway widening project, and in error allowed collateral attack on the previous special assessment proceedings which had established the level of these owners' special assessments consistent with the owners' special benefits arising from the highway project.

"2. The trial court to the prejudice of the plaintiff-appellant City of Englewood Ohio, failed to charge the jury as requested in Instruction No. 1, and thereby failed to instruct the jury to the effect that conforming and nonconforming uses are subject to ordinances and regulations implementing public safety even though enacted after the original use began.

"3. The trial court prejudicially refused requested Instruction No. 2 thereby permitting the jury to award residual damages because of the City's change in the owners' access to and from the street even though the remaining access was clearly reasonable and convenient.

"4. The trial court erred to the prejudice of the Appellant-City refusing to instruct the jury in assessing residual damages to restrict their consideration of future uses of the right of way to those uses which were reasonably probable (Request #6)."

The city's first assigned error addresses an issue which is apparently one of first impression in Ohio: namely, the admissibility of evidence of special assessments which are levied against abutting property owners in order to finance highway improvements. The trial court allowed such evidence over repeated objections by the city. We find no error in the trial court's decision to allow this evidence.

The city attempted to exclude evidence of the special assessments by way of a *motion in limine*, filed on November 3, 1986. In this motion, the city argues that the Wagoners had waived any objections to the assessments by virtue of their failure to lodge those objections before the placement of the assessments on the tax duplicate on August 9, 1985. In other words, the city contends that the Wagoners' failure to present valuation evidence to the city's equalization board at the time of the initial assessments prevents any collateral attack on those assessments. The city argued in its motion that any attempt by the owners to show that the assessments decreased the value of their property could only arise in a situation where the amount of the assessments exceeded the benefits. The city concludes by saying that the owners' failure to object to the assessment precludes introduction of the evidence at trial.

We agree with the city that the assessments cannot be collaterally attacked. The trial judge also agreed with the city; he indicated on several occasions that he was not permitting the evidence to be used for purposes of collateral attack. As the court stated in

response to the city's objection to a statement about assessments made by the Wagoners' counsel during the opening statements:

"THE COURT: That requires me to rule on the motion. *Sustained.* We will accept no evidence relating to that part of the case unless it comes in as a factor with respect to the value of the property. To that extent it may come in, otherwise the motion in limine which was earlier filed is now sustained so that you can adjust your opening statement accordingly.

"* * *

"MR. HUBER: Your Honor, I note my exception. I think, if the Court will, any involvement of that matter in the evaluation process, in the award of compensation of property owners in this case, would allow for collateral attack of those proceedings.

"THE COURT: The Court will not allow any collateral attack, but it's a factor. It's a fact. I understand from what you've told me in chambers that there are taxes on the property. That's a fact. There is an assessment on this property, and that's a fact. And to that extent and what effect it might have on value is proper. But to recoup the assessments, the Court grants your motion to that extent, and that may not be considered by the jury." (Emphasis added.)

The trial judge reiterated that he was not allowing collateral attack on the assessments on numerous occasions. Indeed, counsel for the Wagoners indicated that he was not collaterally attacking the assessments. Rather, the evidence was admitted because it was one of the factors used by the owners' appraiser, Saladin, in making his appraisal. Evidence may be admitted, even though it is inadmissible for one purpose, if it is admissible for another purpose, so long as the court restricts that evidence to its proper scope. Evid. R. 105.

When the state uses its eminent domain power to appropriate land, the general rule is that the landowner is entitled to receive the fair market value of the land taken. *Smith* v. *Walter* (Mar. 9, 1987), Montgomery App. No. 10111, unreported; 38 Ohio Jurisprudence 3d (1982) 233, Eminent Domain, Section 160. The term "fair market value" is usually defined as that price which would be agreed upon between a willing seller and a willing buyer in a voluntary sale on the open market. *Masheter* v. *Ohio Holding Co.* (1973), 39 Ohio App. 2d 49, 53, 67 O.O. 2d 262, 264-265, 313 N.E. 2d 413, 416. In the event of a partial appropriation, the landowner is entitled to receive not only the value of the appropriated land, but also compensation for any damage to the landowner's remaining property (the residue) as a result of the take. *Norwood* v. *Forest Converting Co.* (1984), 16 Ohio App. 3d 411, 415, 16 OBR 481, 485, 476 N.E. 2d 695, 700; *Smith, supra.* Damage to the residue is measured by the difference between the fair market values of the remaining property before, and after, the taking. *Smith, supra;* 38 Ohio Jurisprudence 3d (1982) 237, Eminent Domain, Section 163. In determining the fair market value of the residue before and after the appropriation, all of those factors which would enter into a prudent businessperson's determination of value should be considered. *Norwood, supra,* at 415, 16 OBR at 486, 476 N.E. 2d at 701.

As a general proposition, a prudent businessperson will always consider the special assessments levied against a property in determining what to pay for the property. The Wagoners' evidence showed that the net amount of the assessment was $9,850, with the gross assessment, including interest over fifteen years, to be $18,409.60. The Wagoners' appraiser, Paul Saladin, did testify that assess-

ments of this nature would tend to depreciate the land. He also testified, however, that he was unable to give an opinion on the effects of the assessments because of his inability to find comparable commercial properties which had been sold, either with or without similar assessments on the property. In other words, Saladin was unable to show how similar assessments would have depreciated land in the Englewood area. In response to an inquiry from the court, Saladin stated that although he knew the amount of the assessments, he did not use the assessments in making his appraisal of the property; he did not do so because of his inability to find comparable sales in the marketplace. Saladin's appraisal placed a valuation on the property of $50,000 per acre before, and after, the date of take. Saladin's testimony, taken as a whole, shows that he believed that assessments generally would adversely affect the property value, but he could not say for certain in this case, due to the particular facts and circumstances.

The property owner, Carl Wagoner, also testified concerning the effect of the assessments. Wagoner stated that he had sold a piece of adjacent property which was located north of his store on Union Road. Wagoner testified in part as follows:

"A. We sold two acres directly north of the store, north of my property —

"MR HUBER: Your Honor, I object to this testimony * * *. Secondly, it's well after the date of take in this case.

"THE COURT: The question is limited to the effect of the so-called assessment upon the property in the area. Overruled. * * *

"Q. What happened in the sale of that couple acres?

"A. We had to pay the assess-

ment so that reduced the price that we got for the property."

Wagoner further testified that he sold yet another parcel of land just north of the two-acre tract referred to above. He again stated that the assessments reduced the amount received for the property. The city offered no evidence to rebut Wagoner's testimony.

The city argues that the courts of many states do not allow evidence of special assessments. See, *e.g.*, Annotation, Consideration of Special Assessment in Fixing Severance Damages (1974), 59 A.L.R. 3d 534; *Baldwin Park* v. *Stoskus* (1972), 8 Cal. 3d 563, 105 Cal. Rptr. 325, 503 P. 2d 1333.

While the *Stoskus* case, as well as the cases in the above annotation, does preclude evidence of special assessments, the rule is that such evidence is not admissible "where the condemnor does not seek to reduce or cancel out the amount of severance damages by the amount of special benefit or enhancement in value visited upon the remaining land by virtue of the improvement." Annotation, *supra,* at 537, Section 2.

The courts in these cases give several reasons for this rule. For example, in the *Stoskus* case, *supra,* the California Supreme Court indicated that if a property owner was allowed to recoup the assessment levied against his land, he would essentially be getting a double recovery, *i.e.,* retaining the benefits from the improvement without paying for them. *Id.* at 570, 105 Cal. Rptr. at 329, 503 P. 2d at 1337. The court also pointed out that it would be unfair to allow property owners to recoup the assessment, by virtue of a taking of some of their land, when a similarly assessed neighborhood landowner would be unable to recoup anything, because the state did not take any of his land. *Id.* at 569-570, 105

Cal. Rptr. at 328-329, 503 P. 2d at 1336-1337.

It is clear from the evidence introduced in this case, however, that the city did attempt to offset the negative impact of the assessments with the increase in value of the property due to the highway improvements. The city's appraiser, Henry Halas, indicated that the improvements would increase the value of the property. In addition, counsel for the city asked the following question on cross-examination of the appraiser Saladin:

"Q: Well, if we spent $9,100 to build a bigger parking lot with asphalt and striping on it and spend $9,100 to do that; aren't we going to end up with something that's worth more in the way of a parking lot than that smaller gravel parking lot we started with?

"A: That's a possibility, sir, but your [sic] also only doing it for one reason because the manner of the take is putting the right-of-way up against the building."

The city's attorney, in opening statements, made allusion to a possible benefit to the store:

"But we have to go on. We have to go beyond that point, don't we? And ask ourselves, well, while the residence structure is well removed from the roadway and this taking of additional right of way, what about the business building? Isn't it sitting up front whereas it had a setback from the right of way before, now there is no setback except for one foot. There's one foot difference between the right-of-way line and the front porch in the present situation now that this widening has occurred, but the answer to that question is a little bit different than the one for the residential property and structure. *The evidence will show that businesses like to be up front. * * *"* (Emphasis added.)

Viewing the evidence presented at trial as a whole convinces us that the city did attempt to minimize the damages to the residue by showing the special benefits to the property brought on by the highway improvement. One of the main consequences of the improvement was that the right-of-way came to within a foot of the store. In our view, the fact that the city attempted to offset damages with benefits distinguishes this case from cases such as *Stoskus, supra.* See, also, Annotation, *supra,* at 545-547, Section 4, which compiles cases where courts have allowed evidence of assessments where the condemnor attempts to offset damages with benefits.

In summary, we hold that evidence of special assessments levied against a property owner is admissible as a factor to be considered in the determination of damages to the residue, where the city seeks to offset damages with any special benefits accruing to the property.

The city also contends that it was error to refuse to submit an interrogatory to the jury. The city had requested the judge to give the following interrogatory:

"Question: Do you find that the assessments placed against the property by the City caused any portion of the damages to the residue?

"* * *

"Question: If the answer to the foregoing question is yes, please state the amount of damages to the residue caused by the assessments."

The city contends that Civ. R. 49(B) places a mandatory duty on the trial court to submit interrogatories to the jury. *Cincinnati Riverfront Coliseum, Inc.* v. *McNulty Co.* (1986), 28 Ohio St. 3d 333, 28 OBR 400, 504 N.E. 2d 415.

Based on Rule 49(B) and *McNulty,* the court's refusal to give the requested interrogatory was error. The error was harmless, however, because

we find that the evidence was properly admitted. Thus, the jury's response to the interrogatory is of no consequence to the case. Only if the contrary situation existed, *i.e.,* the evidence was inadmissible, would the jury's response to the question have been relevant; the answer could have permitted a reduction of the judgment. As the evidence was properly admitted, however, the jury's response is irrelevant. The first assignment is overruled.

In its second assignment of error, the city contends that the trial court erred in refusing to instruct the jury that conforming and non-conforming uses are subject to the valid use of the police power to protect the public safety. The requested instruction is set forth in full below:

"The owner of a commercial-zoned property whose off-street parking is not in conformity with applicable ordinances does not have any property right in the continuation of that non-conforming parking arrangement even though such parking was in use before and at the time of the passage of the ordinance.

"Accessory off-street parking requirements are rationally related to several safety hazards which the city may lawfully regulate pursuant to its police powers.

"An owner of property does not acquire immunity against the exercise by a municipality of its police power because such owner began his original operation or use of the property in full compliance with existing laws.

"However, the non-conforming parking arrangement may be considered in determining the market value prior to the appropriation as a positive factor, to be considered with counterbalancing negative element of the risk assumed by a willing buyer that the city in the exercise of its lawful governmental power, might enforce the current off-street parking ordinance."

The facts which concern this assignment are as follows. Since the mid-1950s the parking lot for the shoe store consisted of a gravel area directly in front of the store. This lot was on the same level as Union Road, and there were no curbs or drainage ditches between the parking lot and the road. There was, therefore, unlimited access along the frontage, *i.e.,* automobiles could pull into the lot at any point. About forty feet separated the store from the road.

After the project, however, the change in position of the right-of-way totally eliminated this parking lot. The lot had to be repositioned on the side of the store. Access to this new parking lot consists of two driveways, one on either side of the lot.

The first zoning regulations for the city of Englewood were passed in 1973. It is undisputed that the front parking lot did not conform with these zoning regulations.

The city argues that the regulations concerning parking are based on public safety concerns, and that an "owner of property does not acquire immunity against the exercise, by a municipality, of its police power because such owner began his original operation or use of property in full compliance with existing laws." *C.D.S., Inc.* v. *Gates Mills* (1986), 26 Ohio St. 3d 166, 26 OBR 142, 497 N.E. 2d 295. In essence, the city's position is that a valid exercise of the police power is non-compensable, when based on public safety and welfare. In this case, the city contends that the regulations concerning parking are based on safety considerations, and are therefore not subject to the "grandfather" clause contained in Section 1268.08(a) of the Englewood Zoning Code, which provides:

"(a) *Intent.* Within the districts

established by this Zoning Code or amendments that may later be adopted, there exist buildings and structures, uses of land and structures and lots of record which were lawful before this Zoning Code was passed or amended * * * but which would be prohibited, regulated or restricted under the provisions of this Zoning Code or a future amendment. It is the intent of this Zoning Code to permit these non-conformities to continue until they are removed, but not to encourage their survival."

Wagoner argues that the zoning regulations concerning parking are mere regulations of land use. If the ordinance is intended to regulate land use, then the city may not interfere with a non-conforming use without just compensation. One of the factors that Wagoner points to is the fact that the city never told the Wagoners that their parking lot did not conform to the Code. Under the city's position, Wagoner could have been forced to relocate his parking lot at any time, and the city would not have had to pay compensation. Wagoner contends that the fact that the city did nothing for approximately twelve years clearly shows that the city was not too concerned with safety; that this particular ordinance is merely one that regulates land.

The city's witness, the director of community development, did testify to the effect that the city did nothing about the parking lot because the highway project would cure the problem:

"Q: Mr. Bothwell, you indicated that the reason why Mr. Wagoner was not approached to bring his parking into compliance or what you feel is bringing his parking into compliance was the fact that this project had been anticipated and that it would in essence force the cure of the problem?

"A: That's correct.

"Q: And your testimony now is that this has been the project that has been in contemplation for some 12 or so years; that's right?

"A: Um hmm."

Later in his testimony, Bothwell was asked whether the city would have ever required Wagoner to change any of his parking. To this question, Bothwell replied that it was only "speculation." Wagoner argues that the speculative nature of any enforcement made it improper for the jury to consider any mitigation of damages based on the police power.

We conclude that we do not have to reach the issue of whether the zoning regulations are merely for purposes of land use, or whether they are safety-related. The reason for this conclusion is that the city has misperceived the thrust of the evidence.

The city's premise for this assignment of error is that the amount of damages to the residue, as evaluated by Saladin, was largely created by the loss of the front parking lot. Saladin did testify to the loss of the parking lot frontage. He later testified, however, that the figure he used to value this item of damage was confined to the sum of $9,100, which was the estimate given to him by the city as the cost of relocating the parking:

"Q: I'm asking your opinion as to what is the injury to the real estate value of this structure as a result of the need to reorient or relocate the parking to the side rather than in front of the building.

"* * *

"THE WITNESS: The only part of it that I am contributing to $9,100 is the cost estimate to replace all of the parking that the people have lost in the front. That is what that $9,100 was meant to do * * *. *The $9,100 came as a whole from an estimate which I have and supplied by the City of Englewood of what it would cost to take this park-*

*ing lot and put it over here.* \* \* \* So an opinion in answer to the question is the $9,100 is attributable to the loss of parking." (Emphasis added.)

Given this statement by Saladin, it is apparent that he did not use the relocation of the parking lot as the basis for his valuation of *damage to the residue* in the amount of $46,550. Rather, the estimated cost of cure figure for the parking lot, as provided by the city, appears to be the basis of Saladin's opinion as to the appropriate amount to be awarded as compensation *for the land taken.* Based on this state of the evidence, the judge did not abuse its discretion in refusing to give the instruction.

The question remains, however, as to what evidence was presented to support the jury's verdict on the damages to the residue. As there were no special interrogatories submitted to the jury, we do not know on what basis they made their determination. There was evidence, however, which supports the verdict. After the road was widened, the store became a nonconforming structure by virtue of the fact that the building no longer conformed to the city's set-back regulations. Saladin testified that the greatest part of the damages he found was in the fact that the building was no longer conforming. He testified that because the building no longer conforms to zoning, no future additions or expansion of the building would be permitted under the code unless the building was brought into conformity with the set-back regulations. Given the fact that the right-of-way now comes to within one foot of the building, any attempt to conform would entail the removal of the front of the building to a distance of about twenty-four feet. This opinion is supported by Englewood Code Section 1260.03(c) which provides that "no building shall be erected, converted, enlarged, reconstructed or structurally altered \* \* \* which does not conform and meet the requirement of this Zoning Code, except as provided in Section 1268.08."

The city's appraiser, Halas, testified that he did not take the non-conformity into consideration. He stated that even though the building now violated the set-back provisions, he had been told that the city would allow expansion without the need for zoning compliance:

"A: Well, as I understand it, to this date, there's been no request denied for an addition to a structure that currently violates the 25 foot set-back in Englewood \* \* \*."

Thus, it appears that while the zoning code requires a twenty-five foot setback, the city apparently had not rigorously enforced such provisions. It would seem that the jury could have viewed this lackadaisical enforcement policy rather skeptically. The fact that the city has not enforced its written code in the past is certainly no guarantee that it would not enforce it in the future. The jury probably realized this fact. The second assignment is overruled.

The city's third assignment asserts that it was error for the court not to give an instruction that a change in access to the property is not compensable as long as the access remains reasonable. While this is a correct statement of the law, it does not apply in this case because Wagoner never contended that access to the new parking lot was unreasonable.

Wagoner's appraiser Saladin testified at length about the change in parking. He responded in the following manner to questions put to him on cross-examination.

"Q: Would you agree that this remaining means of access even though not as good as you'd like it to be, as it was before, is what you would agree

and would characterize as being a reasonable means of getting to and from the highway and from the property?

"A: In my mind, sir, it's not the most desirable, but it's there and it's adequate.

"Q: Is it reasonable?

"A: It's adequate and reasonable, yes, sir."

The evidence shows that Saladin's complaint was *not* directed at the access to and from the parking lot. Rather, he was concerned with the fact that the new parking lot was less desirable, in that customers could no longer park in front of the store.

"Q: Then why did you include compensation for the property owner when you acknowledge that the remaining access, means of getting in and out of property, is reasonable?

"A: Because you're talking about nothing but vehicular access, but what are you going to do about the *customer* access, the people that used to park up in front and walk into the side of the building or rather in the front of the building? Now you're going to park them over on the side, they're going to walk around the front. They're going to walk out almost on the right of way to get into this property, and that's also access, not just vehicular, pedestrian and so forth."

Saladin had previously made clear that he included any damages from the change in location in the figure for moving the parking lot:

"Q: I'm asking you how much, how much of this cost that we're spending here, is attributable to that change, how much?

"A: The only part that is contributable [sic] to it is the part that's contributable [sic] for relocating the parking lot which he's completely losing. That's the part that he's usually losing by.

"Q: So that's $9,100.00?

"A: $9,100.00, whatever it is on the cost figure, yes, sir.

"* * *

"Q: But again, you didn't deduct anything because of this median barrier preventing that movement, anyplace like that? You're not deducting anything because of that, is that correct?

"A: No, because he has an opening here that he can get into it. * * *""

While Saladin's testimony is somewhat confusing, it is clear he considered the access to the new parking lot to be reasonable, and that any damages flowing from the change in parking were included in the $9,100 figure for the building of the new lot. His main element of damage was the fact that the building was now a nonconforming structure. The third assignment is overruled.

The city's final assignment is that the court erred in not instructing the jury that they were to restrict their consideration of future uses of the right-of-way to those uses which were reasonably probable. Saladin had made the following statement:

"THE WITNESS: They're taking on the subject property. They have the easement to use that in any way, shape, or form that they want to, and in some future use, I don't know whether they could come in and say, 'Well, look, you don't have any access along there anymore,' but I have seen it done."

Saladin, however, later made clear that he did not speculate as to any future uses:

"Q: Well, this business of limited access, you're not paying compensation to the property owner in your appraisal on the theory that some day the City might come along and erect a limited access line across the frontage and prevent even more access to the property?

"A: No, they couldn't do it. They could do a lot of things, but that would be a separate problem.

"Q: And the property owner

could be compensated at that time; is that correct?

"A: Yes, sir, but it's a possibility in my mind. That's the thing I'm saying.

"Q: But you didn't allow that to affect your opinion, and the jury shouldn't allow it to affect their opinion?

"A: No, no limited access at this time."

We conclude that Saladin's later remarks sufficiently indicated that in valuing the property he did not speculate as to any future infringements on the right-of-way. The refusal of the requested instruction was not error. The final assignment is overruled.

The judgment will be affirmed.

*Judgment affirmed.*

WILSON and BROGAN, JJ., concur.