OPINION
Plaintiff-Appellant, Gordon Proctor, Director of the Ohio Department of Transportation ("ODOT"), brings this appeal from a Hancock County Common Please Court judgment entered on a jury verdict in an appropriation proceeding initiated to acquire 20.703 acres of land from Defendant-Appellee, Paul Wolber, for relocation of U.S. Route 30 in Hancock County.
ODOT maintains that a party may not submit evidence of alternative property uses unless the party has a present intent to use the property for the identified purpose and has taken steps to develop the property toward that use prior to commencement of appropriation proceedings. We find, however, that property owners need not take steps to develop their property prior to appropriation or have a present intent to utilize the property for the use, so long as the necessary adaptability and demand have been established by competent evidence, which shows more than mere speculation or prediction. ODOT also argues that comparable sales must be used to establish valuation, asserting that the evidence Wolber submitted of recent residential splits from agricultural parcels in the region was speculative, misleading, and generally inadmissible. Because residential growth and development in the region would tend to establish the demand for and value of the appropriated acreage and the trial court was in the best position to ascertain the jury's ability to understand the evidence presented and apply it in an appropriate context, we do not find that the trial court abused its discretion in admitting the evidence. Therefore, we affirm the judgment of the trial court.
Procedural history and facts relevant to issues raised on appeal are as follows: Prior to the initiation of appropriation proceedings, Paul and David Wolber owned a 40.060-acre tract of land located in Van Buren Township, Hancock County, approximately one-half mile north of the Hancock-Hardin County line on the east side of Township Road 59. The property had been in the Wolber family for 99 years and had been dedicated to agricultural use.
On June 27, 2000, ODOT initiated appropriation proceedings in the Hancock County Common Pleas Court, seeking permanent acquisition of the northern 20.703 acres of the property. David Wolber transferred his interest to Paul Wolber (hereinafter "Wolber") prior to the date of trial.
The trial court conducted a jury view of the property on July 23, 2001, which was determined, per stipulation, to be the date of take. At trial, ODOT argued that Wolber should be awarded $51,150 for the acreage appropriated and $7,950 for damages to the residue. In contrast, Wolber requested $85,000 for the appropriated acreage and $36,000 for damages to the residue. After two days of testimony and evidence, the jury awarded Wolber $84,642 as compensation for the appropriated acreage and $15,944 as compensation for damages to the residue. The trial court entered judgment on the jury's verdict, and the instant appeal followed.
ODOT presents two assignments of error for our consideration.
 Assignment of Error Number One:
The Trial Court Erred in Admitting Appellee's Evidence of Potential Lot-splits for the Purpose of Valuing Appellee's Property.
 For its first assignment of error, ODOT sets forth several arguments challenging the admissibility of evidence presented for purposes of establishing the fair market value of the appropriated property.
In Ohio, the owner of land taken by appropriation is entitled to compensation for the land taken and for damages to the residue.[1] The measure of damages for both is fair market value.[2] The owner's compensation for the land taken is the difference between the value of the whole immediately before, and the value of the remainder immediately after, the taking.[3] The difference between the value of the residue with the appropriated tract and its value without that portion is the measure of damage to the residue.[4]
A distinction is drawn between "compensation", the sum of money which will compensate the owner for his land taken, regardless of any benefit that may inure to his remaining land because of the proposed public use or improvement, and "damages", which is the payment made for any injury that may result to the remaining land, making allowance for any special benefit that may result to it because of the proposed public use or improvement.[5] "Damages" to the residue are thus part of the landowner's compensation for the public use taking and are not consequential damages resulting from the public use of the improvement.[6]
The perspective from which value is to be viewed is that of an ordinarily prudent business person.[7] To determine fair market value of an appropriated property, the highest and best use for the property must be considered and a value determined as if it were the price agreed upon at a voluntary sale by an owner willing to sell to a purchaser willing to buy the property at its highest and best use, neither under compulsion to do so.[8] However, neither the potential use, demand for, nor the market value of that land can be based upon speculation or mere ability to subdivide, as land having potential for subdivision generally cannot be valued as if already divided and sold, or to be sold as lots without a present demand therefor.[9] Accordingly, when the necessary adaptability and demand have been shown by competent evidence, the use of an agricultural parcel for residential subdivision or splitting off of residential lots may be considered by the jury as the property's highest and best use.[10]
As mentioned previously, the Wolber property is a 40.060 acre tract of land located in Hancock County approximately one-half mile north of the Hancock-Hardin County line. The parcel has approximately seven hundred feet of frontage on the east side of Township Road 59 and extends east therefrom to a depth of over one-half mile. In March of 2001, notice was received that the northern 20.459 acres of the parcel would be appropriated for relocation of U.S. Route 30.
Having witnessed significant residential development of agricultural land within the region and previously split five-acre residential lots from the road frontage of two other agricultural parcels he owned within five miles of the subject property, Wolber set about establishing that there was a present demand for residential splits from agricultural parcels and that the subject property could lawfully and practically be adapted for splits on the Township Road 59 frontage. With lots of five acres or more, applicable zoning regulations only required that lots have a depth at least three times greater than the length of the frontage. Wolber hired a surveyor to stake out lots and an appraiser to value the property with the residential splits, planning to submit evidence that his property could readily accommodate two five-acre lots on Township Road 59, each with a depth three times greater than the frontage.
ODOT asserts that Wolber should have been precluded from submitting evidence of demand or use of the property for residential splits, maintaining that a party may not submit evidence of a property's potential for residential subdivision or split-offs unless the party has a present intent to use the property for the identified purpose and has taken steps to develop the property toward that use prior to commencement of the proceedings. We do not agree.
Wolber testified that although there was a present demand for the residential-agricultural lot splits, the long-term flow of income from farming the property permitted him to support himself, his brother, and his elderly parents. As a result of this benefit and these commitments, he deferred splitting off or selling the lots, relying upon sale proceeds therefrom to provide for his retirement.
The oft cited and well established standard for valuation of appropriated property comes from Sowers v. Shaffer, wherein the Ohio Supreme Court stated:
 "The rule of valuation in a land appropriation proceeding is not what the property is worth for any particular use but what it is worth generally for any and all uses for which it might be suitable, including the most valuable uses to which it can reasonably and practically be adapted."[11]
 As this court has indicated in Smith v. Hendel,[12]
consideration must be afforded to "not only the current use of the property, but also its use for any other beneficial purpose for which it may be lawfully and practically adapted and for which purpose it is probable that there is a present demand affecting the market value of the property to be appraised."[13]
The current use of property to be appropriated, while relevant, is clearly not determinative of its highest and best use. Concomitantly, the owner need not have taken steps to develop the property or have a present intent to use the property for the highest and best use, so long as the necessary adaptability and demand have been proven by competent evidence, surpassing mere speculation or prediction.[14] To impose such unduly prejudicial prerequisites would contravene the right to elect the use to which property is placed and produce inherently inadequate compensation. In this instance, Wolber was certainly free to elect long-term flow of income over short-term gains. Moreover, as discussed below, the level of and necessity for development are variables to be considered in placing a present market value upon the property.[15]
ODOT further argues that comparable sales must be used to establish valuation, concluding that evidence of the recent division and development of residential homesites from agricultural parcels in the region was inadmissible for purposes of valuation.
Recognizing that evidence of prices paid for comparable property "would influence any reasonable and prudent person in making a determination of the market value of the land in question," the Ohio Supreme Court found, in Masheter v. Hoffman,[16] that evidence of sale prices of other comparable real property is admissible "as substantive proof of the fair market value of the property to be appropriated, where such sales were concluded between purchasers who were willing, but not required, to buy and sellers who were willing, but not required, to sell."[17] An arm's length sale of property raises the rebuttable presumption that the sale price reflects the true value of the property; however, unaccepted offers to sell or purchase property do not constitute a sale price and raise no such presumption.[18] To be admissible under the comparable sales valuation method, the properties must be "similar in their situation, relative position and other circumstances relating to value, and are fair in the open market."[19]
However, evidence admissible in eminent domain proceedings, is not limited exclusively to comparable property sales: the Hoffman court specifically indicated that "in determining the amount of compensation, or the fair market value of the property taken, each case must be considered in the light of its own facts, and every element that can fairly enterinto the question of value, and which an ordinary prudent business manwould consider before forming judgment in making the purchase, should beconsidered."[20] Furthermore, entirely different valuation methods may be necessary where demand for the identified use has only recently developed, the property is extremely unique, or comparable sales or other market data are otherwise unavailable or produce an incomplete or inaccurate valuation.
In Hendel, we outlined the interrelationship between a property's value and factors affecting demand for particular uses, stating:
 "Since the question is one of present value, value must be ascertained with reference to the property's present character, situation, and surroundings. Consideration must be given not merely to the fitness of the property for use, but also to the probabilities of the property being wanted, and the wants to be considered are those of the present; the probabilities of the future are not to be taken into account, except as they affect the present. The value cannot be enhanced by considerations of a purely contingent and prospective character.
 "Therefore, it is proper to consider not only the current use of theproperty, but also its use for any other beneficial purpose for which itmay lawfully and practically be adapted and for which purpose it isprobable that there is a present demand affecting the market value of theproperty to be appraised. Those factors must be shown by competentevidence, surpassing mere speculation or prediction."[21]
 Accordingly, in ascertaining whether there is a present demand for a particular use and how that demand affects the property's value, every element that can fairly enter into the question of demand, which an ordinary prudent business person would consider before forming judgment in valuing the property and making the purchase, should be examined and competent evidence thereof admitted.[22] The touchstone of admissibility is whether the evidence is so remote, speculative, or subject to extraneous circumstances, that, even if otherwise relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury; if so, the evidence will be excluded under the parameters of Evid.R. 403(A).[23]
When considering evidence under Evid.R. 403, "the trial court is vested with broad discretion and an appellate court should not interfere absent an abuse of that discretion."[24] Accordingly, we will not reverse the trial court's decision absent an abuse of discretion, which implies the trial court's attitude was unreasonable, arbitrary, or unconscionable.[25]
"A decision is unreasonable if there is no sound reasoning process that would support that decision."[26]
In this instance, evidence that a significant amount of agricultural land in the region has been developed toward residential use is an element that would enter into the question of demand for residential lot splits and an ordinary prudent business person would consider before forming judgment in purchasing the parcel. Therefore, evidence of recent residential splits from and development of agricultural parcels in the surrounding area is admissible as competent evidence of a legitimate and relevant consideration in ascertaining whether there is a present demand supporting the sale of residential lots from the subject property.
To illustrate the character of the region, prove that surrounding vacant agricultural land had undergone recent residential development, and establish present demand for rural residential homesites, Wolber obtained plat maps of surrounding townships, including Van Buren and Orange Townships in Hancock County, and Liberty and Washington Townships in Hardin County. With the assistance of Van Buren Township Trustee, Dave Weihraucht, and neighbor, Dean Redd, Wolber highlighted smaller parcels, which he knew or observed to have been divided from larger agricultural parcels within a three to four mile radius of his farm. 109 splits were identified in Van Buren Township, 41 in the east half of Orange Township, 39 in the east half of Liberty Township, and 14 in the west half of Washington Township. The plat maps were combined and enlarged for use at trial as Defendant's Exhibit No. 1.
Wolber also visited the Hancock and Hardin County Auditors' offices to examine their records for agricultural to residential lot splits in surrounding townships. The Hancock County Auditor's office supplied Wolber a list of its taxing districts, including townships and municipal corporations. From the list, Wolber selected rural subdistricts within Van Buren, Madison, and Orange Townships that surrounded his property. His review of county records produced a total of 244 residential splits from agricultural parcels for the years 1996-'97, 1997-'98, 1998-'99 and 1999-2000. Records for 2000-'01 were unavailable at the time the records were examined. In addition, a deputy clerk for the Hardin County Auditor's office, faxed Wolber a letter indicating that there were approximately 700 parcel splits in all of Hardin County for the years 1997 to 2001, that Washington Township had 30 splits, and that Liberty Township had 139 splits. Wolber combined the Washington, Liberty, Van Buren and Orange Township data for a total of 413 splits in surrounding townships and opined, based upon this evidence and his familiarity with the region, that there was a present demand supporting the sale of residential splits from the subject parcel.
In discussing the admission of Defendant's Exhibit No. 1, concerns arose as to whether the highlighted parcels were limited to residential splits from agricultural parcels and whether Wolber had relied upon hearsay statements of the individuals who assisted him in identifying the splits. Wolber was called to the witness stand, out of the jury's presence, wherein he admitted that he was unable to tell whether all of the highlighted parcels were residential, agricultural, or commercial, but rebuffed contentions that he relied upon hearsay statements, indicating that his knowledge of the splits reflected in the exhibit was derived from living in the area and observing the lots in question and that the individuals with whom he had conferred had merely confirmed the location of splits which he had identified. Although cross-examination indicated that the Hardin County data might not have been limited to residential splits, ODOT did not object thereto or challenge the admission of the exhibit.
ODOT claims that this evidence did not sufficiently represent a connection to the issue of demand for residential splits, was speculative, confusing, misleading, predicated upon hearsay, and failed to establish a market for agricultural to residential sales, asserting that the trial court erred in admitting the exhibit. Although concerned with potential ambiguities in his trial testimony and reliance upon hearsay statements in producing the exhibit, the trial court reserved judgment as to the admission of the exhibit, noting that this evidence had been submitted for purposes of illustrating the character and residential development of the region and that the relevant inquiry was whether the evidence was so speculative or misleading as to unduly prejudice the jury. To address these issues, the court permitted Wolber to reopen his case and take the stand. ODOT conducted extensive cross-examination but declined the opportunity to submit further evidence or call additional witnesses. Upon revisiting the issue, the trial court indicated that re-examination of Wolber had resolved its concerns, that the discrepancies in the exhibit had been relegated to a matter of weight, and that the jury understood the evidence presented and the nature and focus of their duties as the trier of fact. Considering the totality of evidence presented and being wary that exclusion of the exhibit could create additional unanticipated issues or confusion, the court determined that there was sufficient other testimony and evidence related to the matter to permit submission of the exhibit to the jury.
Reviewing the entirety of the record, we do not find the trial court's reasoning to be unsound or that its attitude was arbitrary or unconscionable. The trial court was in the best position to measure the jury's ability to understand their duties and the evidence before them, weigh the evidence presented, and apply the evidence in an appropriate context. Given the trial court's familiarity with the proceedings and broad discretion in these determinations, we find it appropriate to afford deference to its determination that the probative value of the evidence was not substantially outweighed by the danger of confusing or misleading the jury. Accordingly, we do not find that the trial court erred in this regard.
ODOT additionally contends that appropriated property must be valued as a contiguous parcel of singular character, e.g., residential or agricultural, as of the taking date, asserting that our pronouncement inHendel stands for the proposition that evidence of the value of individual lots within the parcel is inadmissible for purposes of valuation.
In Hendel, the landowners sought to establish that the highest and best use to be made of their 49.28 acre parcel of farmland was to divide the entire tract into a suburban residential subdivision and attempted to value the subdivision on the unadjusted per-acre price of one to 11.796 acre unimproved residential building sites sold within two miles of the property. The trial court granted the State's motion to strike the testimony of the owner and his expert witness. We identified the issue presented for review as: "Whether a tract of raw farmland, not sub-divided into building lots, if found to be suitable for such subdivision, may be valued in an appropriation case by comparison to the purchase prices of other unimproved building lots divided from other subdivided tracts[.]" Having examined the record, we found no indication that the trial court had precluded the introduction of evidence of demand or the property's potential for subdivision, except insofar as the valuation of the whole on the basis of the projected value of its subdivided parts or of the parts of other tracts was excluded. While the value of individual parcels is admissible under appropriate circumstances, as discussed below, we upheld the trial court's decision on the grounds that it was within its discretion to exclude evidence of dissimilar, unadjusted sales and was not permissible to value the larger tract on the per-acre sales price for lots of other subdivided tracts where comparison of such sales was subject to an inordinate amount of speculation and conjecture. We did not, however, hold that evidence of the value of individual lots within the parcel was wholly inadmissible for purposes of valuation.
The Ohio Supreme Court delineated the general structure of compensation for appropriated tracts of divisible land in In re Appropriation ofEasements for Highway Purposes, Preston v. Stover,[27] providing:
 "In our per curium opinion in Cleveland Boat Service, Inc., v. City of Cleveland, 165 Ohio St. 429, we stated that loss of profits by the plaintiff is too speculative and uncertain for accurate and satisfactory measurement, citing as authority therefore Sowers, Supt. v. Schaeffer, supra, 459, and 18 American Jurisprudence, 899, Section 259.
 "As remarked by the Supreme Court of Utah in State v. Tedesco et al.,Trustees, 4 Utah 2d 248, 291 P.2d 1028, `a condemnee is not entitled torealize a profit on his property. It must go to the condemnor for itsfair market value, as is, irrespective of any claimed value based on anaggregate of values of individual lots in a subdivision which one hopesto sell at a future time to individuals rather than to an individual.The test is not what the lots will bring when and if 62 willing buyerscome along, but what the tract, as a unit, and as is, platted or not, andin whatever state of completion, will bring from a willing buyer of thewhole tract."[28]
 In essence, where the adaptability and demand for a particular use have been established by competent evidence, the property must be valued at a price that a buyer intending to develop the land for the identified use would pay for the entirety of the appropriated property in its current state of completion. Therefore, although the value of the parcel is not simply the aggregate value of the individual lots, the level of development and price that the individual lots could be sold are legitimate considerations in ascertaining the present market value of the entire parcel.[29] Moreover, one is not required to value the entirety of a parcel as though amenable only to a singular, unified use, when portions thereof can be developed toward a higher use, thereby enhancing the value of the property.
In In re Appropriation for Highway Purposes of Lands of Lunsford, we held that where the process of subdivision, platting, recording, and development had progressed to the point where the individual lots were available as separate units suitable for immediate sale, comparable lots had been sold, and homes were being constructed thereon, that:
 "To insist that the land must be appraised as a whole without reference to individual lot values would, in effect, deprive the owner of a valuation of the highest and best use of the land as individual residence lots and force him to value the land merely as land available for subdivision purposes. Land which is thus divided and presently suitable for sale as individual lots to many buyers would have a higher market value than land which is merely currently suitable for sale as one tract to a single person who would in turn subdivide or develop the land for sale to others. Such a single buyer would have to consider factors of risk, which individual lot buyers would not have to recognize.
 "Therefore, although the question for the jury is the fair market valueof the tract as a whole, evidence as to the individual lot values wouldbe both pertinent and necessary to a consideration of the highest andbest use of the land."[30]
 We then proceeded to explain how this valuation method permits the owner to be compensated for the highest and best use while eliminating any potential profit through consideration of discounting factors, including the need for further development of the property and time and expense incurred in selling the lots:
 "However, the value of the whole parcel would not be the simple mathematical total of the individual lot values. Except in the event of a rare and highly promoted auction sale taking place in a single day, a subdivision is ordinarily sold to a multiplicity of buyers over a period of years. This factor of time must be considered, to arrive at the fair market value on the single day of taking.
"How may this be done? One way is exemplified by the present case. Experts render an educated opinion based on comparable sales of similarly sized and improved tracts to individual purchasers to arrive at the aggregate price which the lots would sell for if willingly sold to individual willing purchasers irrespective of the time factor — i.e., what all lots would sell for to individual purchasers. Then a discount factor based upon the expert's opinion as to the anticipated period it would take to effect such individual sales would be applied, which would on the average correct for the difference between present and deferred receipt of purchase price and for costs of sale not expended.
"We do not conclude that evidence of a sale of all the lots to one buyer would not be proper in certain factual situations where evidence of a market for such sale is available but do conclude that the procedure here used, in the light of the evidence here offered and received, is proper.
"This mode of appraisal does not involve future profits. The landowner is entitled to his highest and best use — the sale to individual lot owners of the lots for residential purposes. The lots are appraised by using comparable sales of lots of similar size and development to obtain, not some future market value, but the value of each lot on the day of taking. No profit factor is involved. And the discount factor allows for the customary costs of sale to many individuals and for the present value of money as opposed to its future value as outlined above."[31]
 The practice of discounting should be taken into consideration simply as an element that would fairly enter into the question of value and which an ordinarily prudent businessman would consider before forming judgment in making a purchase.[32]
Aside from complying with applicable zoning regulations and obtaining a survey of the land, rural agricultural-residential lot splits require no further development: buyers are expected to establish ingress and egress and obtain all utilities and services. Therefore, so long as sufficient evidence was submitted as to the adaptability of the parcel and apparent demand for the residential splits, evidence of the value of undeveloped individual lots of similar size, character, and location would be relevant and admissible for appropriate valuation of the property. Because, as previously discussed, the trial court did not abuse its discretion in determining that sufficient evidence had been presented as to the adaptability and demand for residential splits, we find that admission of evidence as to the value of the individual lots was generally appropriate.
Lastly, ODOT attempts to challenge the competency of the properties identified as comparable sales by Wolber and his appraiser, Larry Degnan, asserting that they failed to appropriately verify, adjust, or discount these sales and merely aggregated the estimated values of the residential splits with the value of the remaining agricultural land.
If, upon cross-examination of a witness who has expressed an opinion with respect to the value of land taken in an appropriation proceeding, it develops that an ambiguity exists regarding an element of value or the evidence forming the basis of an opinion as to value was not appropriately verified, adjusted, discounted, or is otherwise incompetent, on motion the testimony or evidence should be stricken and the jury instructed to disregard it.[33] However, by failing to either move to strike the evidence or object to its admission at trial, ODOT has waived any challenge to its admission on appeal, save plain error.[34]
In civil appeals, "the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."[35] Having reviewed the record herein, we cannot say that any error in the admission of this evidence has challenged or undermined the legitimacy of the judicial process.
Accordingly, ODOT's first assignment of error is overruled.
 Assignment of Error Number Two: The Trial Court Erred When it Permitted an Improper Jury View.
 In its second assignment of error, ODOT argues that the trial court erred as a matter of law and abused its discretion when it permitted a pre-trial jury view of the property to proceed after being notified that Wolber had placed extra stakes on the property, marking out the boundaries of his proposed residential splits.
R.C. 163.12 provides that "[a] view of the premises to be appropriated shall be ordered by the court when demanded by a party to the proceedings." The view of the premises is not evidence and has no substantive effect upon the proceedings; its sole purpose being to assist the jury in understanding the evidence offered by the parties.[36]
Despite the mandatory wording of the statute, "in unusual circumstances the court could exercise its discretion to deny a view."[37] Denial of the view is appropriate where the only purpose it could serve would be to show the property in an unfair light, legislative purpose would not be served in granting the view of the premises, and the benefits of the view are outweighed by the injustice to the property owner and would deprive him of compensation to which he is entitled.[38] Concomitantly, we find that denial is proper where, in the exercise of its discretion, the trial court finds that the prejudicial nature of the view exceeds its illustrative benefits or efficacy.
In this instance, ODOT had staked out the area sought to be appropriated. Concerned with the scale of the parcel and distance between stakes marking the take, Wolber placed additional stakes in a line between ODOT's stakes to better illustrate the shape of the take and general location of the highway. In addition, he staked out the corners of his proposed lot splits. Prior to the jury view, ODOT objected to the placement of the additional stakes, arguing that the purpose of the view was to get an idea of the overall property and the take and that the stakes lent credence to the splits and the weight of the evidence presented. ODOT requested that the stakes be removed prior to the view and volunteered to waive the view altogether if removal was denied.
Considering ODOT's objections, the trial court found that the relevant inquiry was whether the additional stakes were prejudicial and, if so, whether any potential prejudice could be cured through appropriate jury instructions. Noting that the proposed splits were within applicable zoning regulations, the court indicated that it did not regard the stakes to be substantive evidence or prejudicial, that the view would provide the jurors with a basic contextual foundation for evidence to be presented at trial, and that diagrams and other evidence admitted at trial would better illustrate the proposed splits and the take. Wanting to provide the best possible context for the jurors and believing that instructions as to the purpose of the view would cure any prejudice therein, the trial court permitted the view, instructing the jury as follows:
 "What you will observe at the scene is not evidence, the conditions may have changed or might be slightly different. The evidence as to the appearance of the scene will come to you from the witness stand. The purpose of going to this area is to help you understand the evidence when it is presented to you during the course of the trial to give you a context or understanding of what is involved at the particular time."
 We do not find, on the facts of this case, that the trial court erred in permitting the view. The adaptability of the lots for residential splits was uncontested; the determinative issue was the existence of a present demand for residential splits in the region. Staking the lots did nothing more to establish demand than presenting diagrams of the property depicting the proposed splits. Therefore, we do not find that this case presents the "unusual circumstances" wherein the only purpose the view could serve would be to show the property in an unfair light or that any potential prejudice the view could perpetrate upon the parties exceeded its illustrative benefits or efficacy.
Accordingly, ODOT's second assignment of error is overruled.
Having found no error prejudicial to the Appellant herein, in the particulars assigned and argued, the judgment of the trial court is hereby affirmed.
Judgment affirmed.
SHAW, P.J. and HADLEY, J., concur.
[1] In re Appropriation for Hwy. Purposes of Lands of Lundsford
(1968), 15 Ohio App.2d 131, 133, 44 O.O.2d 258, 239 N.E.2d 110; Smith v.Hendel (May 11, 1989), Union App. No. 14-87-6.
[2] Id.
[3] Id.
[4] Id.
[5] Id.
[6] Hendel, citing 38 Ohio Jurisprudence 3d (1982), Eminent Domain Section 178.
[7] Hendel, citing Masheter Dir. Of Hwy. v. Yake (1967),9 Ohio App.2d 327, 38 O.O.2d 384, 224 N.E.2d 540; Sowers v. Sheaffer
(1951), 155 Ohio St. 454, 459, 44 O.O. 419, 99 N.E.2d 313.
[8] Hendel, citing In re Appropriation of Easements for Hwy. Purposes,Preston, Dir. v. Stover-Leslie Flying Service, Inc. (1963),174 Ohio St. 441, 450, 23 O.O.2d 100, 190 N.E.2d 446; Masheter v. Kebe
(1976), 49 Ohio St.2d 148, 3 O.O.3d 86, 359 N.E.2d 74.
[9] Hendel, citing Masheter v. Mariemont (1971), 36 Ohio App.2d 78, 65 O.O.2d 70, 302 N.E.2d 583; Lunsford, 15 Ohio App.2d at 135.
[10] Hendel, citing Cincinnati Springfield Ry. Co. v. Exrs. ofLongworth (1876), 30 Ohio St. 108.
[11] Sowers, 155 Ohio St. 454, at paragraph three of the syllabus (emphasis added); see, also, Evans v. Hope (1984), 12 Ohio St.3d 119,121, 465 N.E.2d 869; Hendel, supra.
[12] Hendel, supra.
[13] Id.
[14] Id.
[15] Lunsford, 15 Ohio App.2d at 135-137.
[16] Masheter v. Hoffman (1973), 34 Ohio St.2d 213, 221, 63 O.O.2d 357, 298 N.E.2d 142.
[17] Id.
[18] Gupta v. Cuyahoga Cty. Bd. of Revision (1997), 79 Ohio St.3d 397,683 N.E.2d 1076; Proctor v. Jamieson (April 6, 2001), Shelby App. No. 17-2000-19.
[19] Hoffman, 34 Ohio St.2d at 221.
[20] Id., quoting 29 A C.J.S. Eminent Domain § 136(5), p. 554 (emphasis added); see, also City of Englewood v. Wagoner (1987),41 Ohio App.3d 324, 326, 535 N.E.2d 736; City of Norwood v. ForestConverting Co. (1984), 16 Ohio App.3d 411, 415, 476 N.E.2d 695.
[21] Hendel, citing 38 Ohio Jurisprudence 3d (1982) 245, Eminent Domain, Section 167
[22] Cf. Hoffman, 34 Ohio St.2d at 221, quoting 29 A C.J.S. Eminent Domain § 136(5), p. 554; see, also Englewood, 41 Ohio App.3d at 326;Norwood, 16 Ohio App.3d at 415.
[23] Hendel, citing Evid.R. 403(A); City of Springfield v. BealsIndustries, Inc. (1958), 106 Ohio App. 452, 454, 7 O.O.2d 190,155 N.E.2d 501.
[24] State v. Allen (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675.
[25] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,450 N.E.2d 1140.
[26] AAAA Enterprises, Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597.
[27] In re Appropriation of Easements for Highway Purposes,174 Ohio St. 441, 23 O.O.2d 100, 190 N.E.2d 446.
[28] Id. at 448 (emphasis added).
[29] Lunsford, 15 Ohio App.3d at 136-137.
[30] Id. at 135-136.
[31] Id.
[32] Cf. Porkorny v. Local No. 310, Intern. Hod Carriers Bldg. AndCommon Laborers Union of America (1974), 38 Ohio St.2d 177, 182, 67 O.O.2d 195, 311 N.E.2d 866, citing Masheter v. Hoffman (1973),34 Ohio St.2d 213, 221, 63 O.O.2d 357, 298 N.E.2d 142, 147.
[33] Lunsford, 15 Ohio App.2d at 138; Hendel, supra.
[34] Lunsford, 15 Ohio App.2d at 138; Gollihue v. ConsolidatedRail Corp. (1997), 120 Ohio App.3d 378, 388-389, 697 N.E.2d 1109;Blanton v. Internatl. Minerals Chem. Corp. (1997), 125 Ohio App.3d 22,28, 707 N.E.2d 960; Evid.R. 103(A)(1).
[35] Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, syllabus,697 N.E.2d 1099 (citations omitted).
[36] City of Akron v. Alexander (1965) 5 Ohio St.2d 75, 77, 34 O.O.2d 155, 214 N.E.2d 89, citing Zanesville, Marietta Parkersburg Rd. Co. v.Bolen, (1907), 76 Ohio St. 376, 377, 81 N.E. 681.
[37] Alexander, 5 Ohio St.2d at 77-78 (interpreting nearly identical language of former R.C. 719.10). See, also Hagan v. Madison Ave. LandCo. (March 21, 1991), Cuyahoga App. No. 58153, cause dismissed by61 Ohio St.3d 1433, 575 N.E.2d 465.
[38] Id.