BLANTON et al., Appellants,

v.

INTERNATIONAL MINERALS AND CHEMICAL
CORPORATION et al., Appellees.

[Cite as *Blanton v. Internatl. Minerals & Chem. Corp.* (1997), 125 Ohio App.3d 22.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–970115.

Decided Dec. 19, 1997.

**24**

*Robbins, Kelly, Patterson & Tucker* and *Daniel J. Temming,* for appellants.

*Thompson, Hine & Flory, L.L.P.,* and *Earle J. Maiman,* for appellee International Minerals & Chemical Corp.

*Roetzel & Andress* and *Douglas M. Kennedy,* for appellee Hamilton Foundry and Machine Co.

PAINTER, Presiding Judge.

Timothy Blanton, plaintiff-appellant, worked for defendant-appellee Hamilton Foundry and Machine Co. operating a "CB–22" core-making machine.[1] The machine produces cores by compressing a sand mixture with a gas. Simply stated, the CB–22 makes cores when two halves of a box-shaped mold come together. At the foundry, an employee usually operated the CB–22 in "lock-down" position, where the box's right side was locked in a stationary position through air pressure and the box's left side closed on it when the operator started a cycle. During lock-down, the box's right side was held in position by two steel stop rods. After a core was produced, the box's left side retracted. Then the machine operator had to put his hand between the sides of the box to remove the core. Apparently, removing the cores by hand was the only way to accomplish the task—the cores were too fragile to remove with a device such as tongs.

The foundry acquired the CB–22 in 1985 or 1986, and during the next seven or eight years stop rods occasionally broke. As many as seven rods may have broken during this period, but there were no injuries to any operators before Blanton was injured. On January 27, 1993, when Blanton placed his hand into the box area to remove a core, the stop rods broke and the two halves of the mold came together. He suffered severe and permanent damage to his right hand and forearm.

---

**1.** Linda Blanton is also a plaintiff-appellant. She brought a loss-of-consortium claim.

Blanton received workers' compensation for his injury, but he also filed suit against the foundry for an intentional tort and against defendant-appellee International Minerals and Chemical Corp. ("Redford Carver"), the manufacturer of the machine, under product-liability theories. Particularly, in the product-liability claim, Blanton attempted to prove that it was Redford Carver's stop rods that had broken and that the design for the stop rods was defective. Blanton also claimed that the machine was defective when locked down because this method allowed too much pressure to be stored in the machine while an operator had to place his hand in the box area to remove a core. After Blanton presented his evidence to the jury, the trial judge directed a verdict for the foundry. The jury later returned a verdict for Redford Carver. In seven assignments of error, Blanton appeals the trial court's directed verdict and also raises alleged errors relating to the claim against Redford Carver.

## I. Intentional–Tort Claim

In his first assignment, Blanton asserts that the trial court erred in granting a directed verdict for the foundry. We overrule this assignment.

The workers' compensation system has all but eliminated the ability of employees to sue their employers for injuries sustained in the workplace. A narrow exception exists in situations where an employer's conduct is sufficiently egregious in causing the injury. In *Fyffe v. Jeno's, Inc.*, the Ohio Supreme Court set out a test for determining whether an employee can bring an intentional-tort action against an employer for an injury received in the workplace.[2] *Fyffe's* first two syllabus paragraphs provide the applicable test and a less-than-definitive explanation of when a substantial certainty of injury exists:

"1. Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keeton on Torts (5 Ed.1984), in order to establish "intent" for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. [Citation omitted.]

"2. To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established.

---

2. *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108.

Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty— is not intent." (Citation omitted.)

After reading these pronouncements, one is left with the distinct impression that each case turns on its own facts.

We need only to focus on the second part of the *Fyffe* test. To satisfy the test's second part, a plaintiff must show that the employer had knowledge that harm to the employee would be a substantial certainty if the employee was subjected by his employment to a dangerous process, procedure, instrumentality, or condition. Paragraph two of the syllabus in *Fyffe* purports to delineate a type of continuum—establishing that an employer acted with "intent" (that an injury was substantially certain to occur) requires proof greater than negligence or even recklessness on the part of the employer.

While it may have been negligent or possibly even reckless for the foundry to continue equipping the CB–22 with inferior rods that occasionally broke, the foundry did not know that an injury was substantially certain to occur. First, an injury had never occurred before because a rod had broken on the machine. Though the lack of a prior injury is not fatal to a plaintiff's case, it is evidence tending to show that an employer did not have knowledge that an injury was substantially certain to occur.[3]

Most important, though, Blanton did not present any evidence concerning how much time an operator's hand was vulnerable to injury while in the workplace. The greater the amount of time that an operator's hand was within the core-making box while the machine was in the lock-down position, the greater amount of time an operator's hand would be exposed to a risk of injury had the rods broken. Because rods broke so infrequently, averaging at most about once per year, an operator's hand would have had to be within this zone of danger for a substantial percentage of the time that the machine was locked down to reach a substantial certainty of injury. Blanton presented no evidence of how many

---

**3.** See, *e.g.*, *Taulbee v. Adience, Inc.* (1997), 120 Ohio App.3d 11, 696 N.E.2d 625; *Knott v. Bridgestone/Firestone Tire & Rubber Co.* (Sept. 25, 1996), Summit App. No. 17829, unreported, 1996 WL 539186; *Cook v. Cleveland Elec. Illum. Co.* (1995), 102 Ohio App.3d 417, 657 N.E.2d 356; *Foust v. Magnum Restaurants, Inc.* (1994), 97 Ohio App.3d 451, 646 N.E.2d 1150.

times he had to put his hand in the machine each shift, or how long his hand remained in the machine exposed to a possible danger. From a description of the operator's duties in removing a core, it seems that an operator's hand would have only been exposed to danger for a few seconds at any given time. We do not believe that this infinitesimal percentage of time that an operator's hand could be injured leads reasonably to a conclusion that there was a substantial certainty of injury.

Because the foundry did not know that the inferior stop rods it used were substantially certain to cause injury, Blanton did not prove the second prong of the *Fyffe* test. When reviewing a directed verdict against a plaintiff, we must consider whether the evidence presented by the plaintiff is legally sufficient to submit the case to a jury, assuming the truth of the evidence supporting the facts essential to the plaintiff's claim and granting the plaintiff all reasonable inferences.[4] If there is any substantive evidence to support the plaintiff's claim, upon which reasonable minds could reach different conclusions, the directed verdict must be overturned.[5] Because sufficient evidence did not support the second prong of the *Fyffe* test, the trial court properly directed a verdict for the foundry.

## II. Evidentiary Issues

After the trial court properly directed a verdict for the foundry, the case proceeded to trial solely against Redford Carver on product-liability issues. In his second, third, fourth, sixth, and seventh assignments, Blanton argues that the trial court erred in admitting various evidence and testimony. We reject Blanton's contentions.

Blanton first alleges that the trial court erred in admitting Redford Carver's sales records without a properly established foundation for their admission. However, when these documents were introduced, Blanton specifically objected to the reading of the documents by a witness because the "documents speak for themselves." Blanton did not object to an improper foundation for admitting the documents. In fact, Blanton's objection was not even aimed at excluding the documents themselves, but only at preventing the testifying witness from reading them. The failure to object to the admission of evidence generally waives the right to assign error on appeal.[6] The trial court did not err in admitting the sales records absent a proper objection.

---

**4.** *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935; *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 671 N.E.2d 252.

**5.** See *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 28 OBR 410, 504 N.E.2d 19.

**6.** See *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 70 O.O.2d 123, 322 N.E.2d 629; *LeFort v. Century 21–Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 512 N.E.2d 640; *Dillon v.*

## Expert Testimony

Blanton further argues that the trial court erred in allowing Redford Carver's expert, Salvatore Malguarnera, a Ph.D. in mechanical engineering, to give an expert opinion because his opinion was based on facts and information not admitted into evidence at trial. This argument is without merit.

Evid.R. 703 defines the bases that an expert may rely upon when giving an opinion: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." But this court has noted that the Ohio Supreme Court softened the foundational requirement in Evid.R. 703 in *State v. Solomon* (1991), 59 Ohio St.3d 124, 570 N.E.2d 1118.[7] In *Solomon's* syllabus, the Ohio Supreme Court changed the import of the language in Evid.R. 703: "Where an expert bases his opinion, in whole or in major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied."

■ Reviewing Malguarnera's testimony, we are convinced that it was based in major part on those things perceived by him or admitted in evidence at trial. Malguarnera examined the CB–22 on which Blanton was injured. He examined the stop rods that were on the CB–22 at the time Blanton was injured. He also examined an exemplar of a Redford Carver stop rod. Although Malguarnera read depositions to help him understand how the accident occurred, his testimony, which mainly concerned the structural integrity of the rods, was based in major part on his own examinations. Thus, the trial court did not err by allowing Malguarnera to testify.

## Ultimate–Issue Testimony

Next, Blanton argues that the trial court erred by allowing Redford Carver's expert to testify that there would not have been an accident if Redford Carver's rods were on the CB–22 when Blanton was injured. Blanton claims that the trial court improperly allowed Malguarnera to testify about an ultimate issue of fact.

■ Testimony concerning an opinion on an ultimate issue is not *per se* excludable under Evid.R. 704.[8] Ultimate-issue testimony must minimally satisfy

---

*Waller* (Dec. 26, 1995), Franklin App. No. 95APE05–622, unreported, 1995 WL 765224; Evid.R. 103(A)(1).

7. See *Loura v. Adler* (1995), 105 Ohio App.3d 634, 664 N.E.2d 1002; see, also, *Gen. Acc. Ins. Co. v. Black & Decker, Inc.* (Nov. 13, 1996), Hamilton App. No. C–950473, unreported, 1996 WL 656355.

8. See *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 524 N.E.2d 881.

the requirements of all the rules of evidence.[9] Thus, an expert's ultimate-issue testimony must minimally satisfy Evid.R. 702, which requires that the testimony be helpful to, or assist the trier of fact in, the determination of a factual issue. The trial court has substantial discretion in its rulings as to the admissibility of ultimate-issue testimony.[10]

Malguarnera described the strength of Redford Carver's stop rods and how much pressure the CB–22 machine produced. He gave specifics about what portions of the rods had been receive the highest average stress. He then concluded that if Redford Carver stop rods had been used on the machine, the accident would not have occurred. The trial court may have allowed Malguarnera to testify to the ultimate issue to help the jury to understand the import of his technical testimony. We cannot say that the trial court abused its discretion in admitting the ultimate-issue testimony.

Similarly, Blanton asserts that the trial court erred by allowing Redford Carver's president, William Zachery,[11] to express his opinion on an ultimate issue of fact—whether there was a danger in operating the CB–22 in the locked position if it were equipped with Redford Carver's stop rods. Blanton objected to the question on hearsay grounds, but not with regard to Evid.R. 701, 703, or 704. He thus waived his right to appeal the ruling on grounds other than hearsay. Further, we cannot perceive any prejudice to Blanton that would require reversal because there is ample evidence in the record demonstrating that Redford Carver's rods were not on the machine at the time Blanton was injured. Finally, even if Zachery were not an expert witness, he could express an opinion that was rationally based on his perceptions and helpful to a clear understanding of his testimony or to the determination of a fact in issue.[12] The trial court did not abuse its discretion by allowing Zachery's statements.

### Evidence of No Prior Accidents

Lastly, Blanton asserts that the trial court erred by allowing testimony of no prior injuries resulting from, and no prior failures of, Redford Carver's stop rods. We also reject this contention.

---

9. Weissenberger's Ohio Evidence (1997) 327, Section 704.3.

10. See *id.* at 328, Section 704.4; *Bostic, supra.*

11. Though the name is spelled Zachary in the record, Redford Carver's brief reflects the true spelling to be Zachery. He never spelled his name at trial.

12. See Evid.R. 701.

**30**

■ Because the trial court directed a verdict in favor of the foundry, the trial proceeded only on a product-liability theory against Redford Carver. Blanton alleged that Redford Carver's stop rods were defectively designed. A product is defectively designed "if either the foreseeable risks associated with the design exceed the benefits associated with that design, or the product is more dangerous than an ordinary consumer would expect when used in a reasonably foreseeable manner."[13]

■ Blanton argues that evidence of no previous accidents or injuries is irrelevant in a strict-liability claim where the evidence's purpose is to show knowledge or notice of prior accidents to the product's maker. Though we agree that this evidence may be irrelevant for that purpose, we believe that evidence of no prior accidents or injuries, during a period when a product was used in a substantially similar manner, is probative of whether the product caused the injury at issue. Though the evidence may not be relevant to whether the product in fact had a design defect, it is relevant to whether the defect proximately caused the injury.

We have found little Ohio case law on this precise issue. In *Renfro v. Black,* the Ohio Supreme Court has held that evidence of prior accidents or injuries is admissible if the prior accidents occurred under circumstances substantially similar to those at issue in the case at bar.[14] But there are few references in Ohio law concerning the converse—whether evidence of no prior accidents or injuries is admissible. In a concurring opinion in a different case, Justice Holmes of the Ohio Supreme Court stated that evidence of no prior accidents or injuries would be admissible in a product-liability suit, though the issue was not before the court on appeal.[15] And in a product-liability suit, the Lucas County Court of Appeals, without a detailed analysis, allowed evidence that the manufacturer of a flagpole had not received prior complaints concerning the flagpole's safety or accidents associated with its use.[16] A few years later, that court allowed a

---

13. *Welch Sand & Gravel, Inc. v. O & K Trojan, Inc.* (1995), 107 Ohio App.3d 218, 224, 668 N.E.2d 529, 533, citing R.C. 2307.75(A)(1) and (2); see, also, *Nadel v. Burger King Corp.* (1997), 119 Ohio App.3d 578, 695 N.E.2d 1185. For products designed after January 27, 1997, only the risk-benefit test is used.

14. *Renfro v. Black* (1990), 52 Ohio St.3d 27, 556 N.E.2d 150, citing *McKinnon v. Skil Corp* (C.A.1, 1981), 638 F.2d 270, 277.

15. *Drake v. Caterpillar Tractor Co.* (1984), 15 Ohio St.3d 346, 15 OBR 468, 474 N.E.2d 291 (Brown and Holmes, JJ., concurring).

16. *Hall v. Sun Oil Petroleum Prods.* (Sept. 28, 1984), Lucas App. No. L–84–084, unreported, 1984 WL 14378.

different defendant to present evidence showing no or few prior accidents or injuries in a product-liability suit.[17]

The Supreme Court of Pennsylvania recently encountered this very issue in *Spino v. John S. Tilley Ladder Co.*[18] The court held that "evidence of the non-existence of prior claims is admissible subject to the trial court's determination that the offering party has provided a sufficient foundation—that they would have known about the prior, substantially similar accidents involving the product at issue." [19] In *Spino,* a ladder manufacturer's president testified that during his thirty years with the company, he had never been informed that a product had failed in the way that the plaintiff alleged. The ladder manufacturer also introduced its claims log, which documented all reports, claims, or problems involving its ladders. The court determined that the president's testimony was admissible and explained that the plaintiff had the opportunity to cross-examine the president about his knowledge of prior accidents, injuries, or claims and about the maintenance of the claims log. The court also stated that there is little logic in admitting evidence of prior similar accidents but never admitting their absence.

 We agree with the reasoning in *Spino.* We hold that evidence of the nonexistence of prior accidents or injuries is admissible if a proper foundation is laid establishing that the offering party would have known about any prior, substantially similar accidents or injuries involving the product at issue. Our holding is in conformity with many other jurisdictions as well.[20]

William Zachery testified that during his employment he had never received any report of a stop rod failing or of any injury occurring from a stop rod's failure. As the *Spino* court noted, this type of testimony is admissible and

---

**17.** *Knitz v. Minster Machine Co.* (Feb. 9, 1987), Lucas App. No. L–84–125, unreported, 1987 WL 6486 (following remand in *Knitz v. Minster Machine Co.* [1982], 69 Ohio St.2d 460, 23 O.O.3d 403, 432 N.E.2d 814).

**18.** *Spino v. John S. Tilley Ladder Co.* (1997), 548 Pa. 286, 696 A.2d 1169.

**19.** *Id.* at 1173.

**20.** See, *e.g., Ryan v. KDI Sylvan Pools, Inc.* (1990), 121 N.J. 276, 579 A.2d 1241 (evidence of no prior accident or injury relevant to whether product had risk or not, or whether product's utility outweighed risk); *Watkins v. Toro Co.* (Mo.App.1995), 901 S.W.2d 917 (evidence admissible when absence of injuries documented during product use under substantially similar conditions and adequate number of situations existed to make an absence meaningful); *Espeaignnette v. Gene Tierney Co.* (C.A.1, 1994), 43 F.3d 1 (absence of prior accidents tends to disprove causation and is relevant to whether the product as designed was unreasonably dangerous); *Benson v. Honda Motor Co.* (1994), 26 Cal.App.4th 1337, 32 Cal.Rptr.2d 322; *Minichello v. U.S. Industries, Inc.* (C.A.6, 1985), 756 F.2d 26; *Johnson v. Lowes of La., Inc.* (La.App.1993), 627 So.2d 177; Annotation, Products Liability: Admissibility of Evidence of Absence of Other Accidents (1987), 51 A.L.R.4th 1186, 1987 WL 419466.

subject to cross-examination. Blanton could have cross-examined Zachery about record keeping concerning the stop rods or Zachery's knowledge of possible unreported injuries. Thus, Zachery's testimony was admissible, but cross-examination could have attacked the weight of this evidence. The trial court did not err by allowing Redford Carver to present testimony that there were no prior injuries attributable to Redford Carver's stop rods and that the stop rods had not failed in the past.

### III. Jury Interrogatory

In his fifth assignment, Blanton asserts that the jury's answer to a special interrogatory was against the manifest weight of the evidence. The jury found that Blanton and his wife suffered no injuries. In light of the verdict for Redford Carver, the jury probably meant that the Blantons suffered no injuries caused by Redford Carver—it was undisputed that Blanton's hand and forearm were severely damaged by the machine. However, this assignment is moot because the jury found that Redford Carver was not liable for damages at all.

### IV. Conclusion

The trial court properly directed a verdict for the foundry because the foundry did not know with substantial certainty that an injury would occur. We further reject Blanton's evidentiary challenges with respect to the product-liability claims against Redford Carver. We therefore leave the judgment entered upon the jury verdict in favor of Redford Carver undisturbed.

*Judgment affirmed.*

GORMAN and SUNDERMANN, JJ., concur.