DECISION AND JUDGMENT ENTRY
{¶ 1} Appellants, Robert and Mary Hertzfeld, appeal the trial court's grant of summary judgment to appellee, Hayward Pool Products, Inc., on their product liability claims. Appellants claimed damages for injuries sustained when they tried to open a swimming pool chlorine feeder manufactured by Hayward. The trial court erred in *Page 2 
excluding appellants' expert witness, genuine issues of material fact remain, and the grant of summary judgment is reversed.
 {¶ 2} Appellants' chlorine feeder was a Hayward Model CL220 "off-line" feeder. "In-line" feeders are not meant to be removed for service or storage once installed; the off-line feeder requires removal, winterized storage, and re-installation. Mary had sealed the feeder for winter storage with chlorine tablet residue still inside. She had also connected the water inlet and outlet ports with a small plastic tube, effectively sealing the unit closed. The chlorine tablet residue caused chlorine gas to build up under high pressure inside the closed feeder container. The pressure created by the expanding chlorine gas tightened the plastic cap. The feeder, unlike other Hayward models and other manufacturers' chlorine feeders, did not have a dedicated opening tool or a pressure escape valve. When Mary went to de-winterize and re-install the feeder in June 2003, the feeder cap was too tight to open by hand. While Robert held the cylindrical feeder steady, Mary tapped the cap with a hammer to loosen it. The resulting explosion injured both.
 {¶ 3} Appellants grounded their claims in four theories of liability: breach of the implied warranty of safety, strict liability, negligence in the product's design and warning, and statutory products liability. In support, they presented the expert testimony of Robert Yano, a registered professional mechanical engineer, who opined in a deposition and in an affidavit and report, that Hayward's chlorine feeder was defectively designed, lacked adequate warnings, and was not subjected to adequate safety testing. *Page 3 
 {¶ 4} Hayward moved to disqualify Yano's expert testimony on two grounds: First, that he lacked expert qualifications; second, that his opinions were not based on adequate and reliable scientific methodology. Hayward also moved for summary judgment, arguing that, if Yano's testimony were stricken, appellants' claims would be rendered baseless. Alternatively, Hayward argued that even if Yano's expert opinion were not stricken, appellants' misuse of the feeder was not foreseeable, they could not prove the alleged defect proximately caused their injuries, the warnings Hayward provided were clear, and that appellants failed to heed the warnings.
 {¶ 5} The trial court granted Hayward's motion to disqualify appellants' expert. Specifically, it held that Yano had "absolutely no prior experience in this type of case" and that his opinions were based on "outdated regulations and improper assumptions." In granting Hayward's motion for summary judgment, the trial court explicitly adopted Hayward's analysis and conclusion that appellants' misuse of the feeder was not foreseeable when Hayward placed it in the stream of commerce.
 {¶ 6} Appellants have assigned two errors for review:
 {¶ 7} "The trial court erred in excluding the testimony of plaintiffs' mechanical engineering expert Robert Yano, P.E.
 {¶ 8} "The trial court erred in granting defendant's motion for summary judgment."
 {¶ 9} Having reviewed the entire record in this matter, we find both of appellants' assignments of error well-taken. First, the trial court abused its discretion when it granted *Page 4 
Hayward's motion to strike appellants' expert's testimony and opinion.State v. Williams (1983), 4 Ohio St.3d 53, syllabus. Yano is qualified to testify as an expert witness pursuant to Evid.R. 702(A) and (B) and his opinions are relevant and reliable pursuant to Evid.R. 702(C).
 {¶ 10} Evid.R. 702 provides:
 {¶ 11} "A witness may testify as an expert if all of the following apply:
 {¶ 12} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 13} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 14} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 15} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 16} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 17} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result." *Page 5 
 {¶ 18} Hayward first argued that Yano was unqualified as an expert because he lacked the requirements of Evid.R. 702(B). The trial court adopted Hayward's analysis as set forth in its motion to disqualify. Hayward (and, therefore, the trial court) focused specifically on Yano's lack of experience with pool equipment and pool systems.
 {¶ 19} To be admissible, an expert's testimony must be both relevant and reliable. Daubert v. Merrill Dow Pharmaceuticals (1993),509 U.S. 579, 597. The trial judge acts as a gatekeeper to ensure that evidence which is not relevant or unreliable does not reach the trier of fact. To be relevant, a witness must demonstrate expert qualifications in the relevant area of inquiry. Id. at 591. Whether a witness is qualified to render expert testimony pursuant to Evid.R. 702(B) is a threshold inquiry, Scott v. Yates (1994), 71 Ohio St.3d 219, 221, separate and distinct from the "reliability" requirement. The witness must possess knowledge in the relevant subject area superior to the ordinary juror or layperson. Id.; Evid.R. 702(A). Further, the "fit" between an expert's qualifications and the area of inquiry determine whether the expert's opinion is relevant. Daubert, 509 U.S. at 591; Evid.R. 702(B). "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." Berry v. Cityof Detroit (C.A. 6, 1994), 25 F.3d 1342, 1351.
 {¶ 20} Hayward contends that Yano's lack of specific experience with pool equipment renders him unqualified. Hayward rightly points out that a "witness is not an expert simply because he claims to be." TharoSystems, Inc. v. Cab Produkktechnik *Page 6 GMBH Co. KG (C.A. 6, 2006), 196 Fed. Appx. 366, 375, citing Pride v.BIC Corp. (C.A. 6, 2000), 218 F.3d 566, 577. The relevant area of inquiry, however, should not be defined so narrowly as to exclude testimony which would assist the trier of fact. "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact. The fact that a proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity affects the witness' credibility, not his qualifications to testify." FirstTennessee Bank Nat. Ass'n v. Barreto (C.A. 6, 2001), 268 F.3d 319, 333, quoting Davis v. Combustion Eng'g, Inc. (C.A. 6, 1984), 742 F.2d 916,919.
 {¶ 21} For example, a licensed electrician with extensive experience in electricity, electrocution, and wiring systems was qualified to opine as to whether an amusement park's ride electrical systems were properly grounded. State v. Rock, 11th Dist. No. 2004-L-127, 2005-Ohio-6285, ¶ 71. It was unnecessary for him to demonstrate experience with amusement park rides specifically. Id. Similarly, a witness's general training in metallurgy and experience in failure analysis rendered him qualified to give expert opinion as to whether metal strand portion of automobile tires was defective, notwithstanding his never having designed a tire. Colboch v. Uniroyal Tire. Co., Inc. (1996),108 Ohio App.3d 448, 461. A threat assessment expert did not need experience in the specialized area of commercial bus line threat assessment in order to opine on the adequacy of bus driver training in threat assessment.Surles ex rel. Johnson v. Greyhound Lines, Inc. (C.A. 6, 2007),474 F.3d 288, 294. *Page 7 
 {¶ 22} Hayward cites our decision in Hamilton Mutual Ins. Co. v. FordMotor Co. (1997), 122 Ohio App.3d 611, in support of its argument that appellants require an expert with specific experience in pool equipment. In Hamilton, we held that a certified fire and explosion investigator who had no experience in the design and manufacture of automobiles or their components was unqualified to opine as to the alleged defectiveness of a fuel injector and whether it caused a fire. In that case, even if the witness limited his opinion to the origin of the fire, it would not be circumstantial evidence of a design defect in the fuel injector.
 {¶ 23} Impliedly, then, the witness would have been qualified to opine as to the origin of the fire — which was his area of expertise. The rejection of his testimony had less to do with whether he was qualified and more with whether his qualifications were relevant and "fit" with the issue at hand. That is, the fact that a fire originates in a fuel injector does not alone support a conclusion that the fuel injector is defective.
 {¶ 24} Berry v. City of Detroit, supra, gives an excellent illustration with respect to the relevance, or "fit," of particular scientific expertise with a particular issue:
 {¶ 25} "[I]f one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts. *Page 8 
 {¶ 26} "On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have."Berry, 25 F.3d at 1349-1350.
 {¶ 27} Keeping with the analogy, appellants' witness offers testimony more similar to that of an aeronautical engineer than a beekeeper. Although Yano may not have specific experience with pool equipment, his r É sum É lists knowledge and experience of "mechanical equipment evaluations, analysis and testing, and a determination of feasible safety standards for mechanical equipment" beyond the ordinary juror or layperson. Hayward's chlorine feeder — a relatively simple machine — and the issues — whether the product is defective and its warnings inadequate when it can create a dangerous pressurized buildup of chlorine gas — do not require more specialized knowledge and experience to understand than that of a mechanical engineer. The expert testimony required with respect to Hayward's chlorine feeder is not as specialized as that required for press brake operation and safeguarding, Vermett v.Fred Christen Sons Co. (2000), 138 Ohio App.3d 586, or bridge design.Vistein v. Keeney (1990), 71 Ohio App.3d 92. Both Vermett andVistein found the offered engineering expert qualified to testify regarding general engineering principles, but found the factual issues to require more *Page 9 
specialized engineering knowledge. The factual issues raised by an exploding chlorine feeder do not.
 {¶ 28} Hayward also notes that Yano has never rendered expert opinions as to the adequacy of product warnings, arguing that this lack of experience renders him unqualified to testify. This argument is also not well-taken. A witness should not be disqualified as an expert because he has never rendered an opinion regarding the adequacy of warnings on a particular type of product. Zapoola v. Leibinger, 8th Dist. Nos. 86038, 86102, 2006-Ohio-2207, ¶ 69-70. Otherwise, no new testifying experts would exist.
 {¶ 29} Second, Hayward argued in its motion to disqualify that Yano's opinions were unreliable pursuant to Evid.R. 702(C). "A trial court's role in determining whether an expert's testimony is admissible under Evid.R. 702(C) focuses on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial." Miller v. Bike Athletic Co. (1998) 80 Ohio St.3d 607, paragraph one of the syllabus. "In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." Id. at 611. "The focus is `solely on principles and methodology, not on the conclusions that they generate.'" Id. at 612, citing Daubert, 509 U.S. at 595. Despite an expert's qualifications, his testimony may be *Page 10 
inadmissible if it is scientifically unreliable. Valentine v.Conrad (2006), 110 Ohio St.3d 42, 44.
 {¶ 30} Yano rendered a three-part opinion in his expert report, based upon his review of, inter alia: appellants' exploded feeder; appellants' depositions; Hayward's engineering expert's deposition; the CL220's patent; the owner's guide and installation and operating instructions; discovery provided by Hayward; literature regarding chlorine, design and warning safety; and National Sanitation Foundation safety standards for chlorine feeders.
 {¶ 31} First, he opined that the CL220 was defectively designed. It enables a user to create a closed system by sealing off the water inlet and outlets; if the user leaves wet chlorine inside, chlorine gas may create high pressure. Without a dedicated cap opening device or a pressure relief device, an explosion hazard results.
 {¶ 32} Second, he found the labeling on the feeder inadequately warned a user of the potential hazard of "a high pressure explosion resulting from storing a sealed-up feeder, containing wet caked chlorine, over the winter" and "a high-pressure explosion resulting from tapping on the stored sealed-up feeder, containing wet chlorine (and now high-pressure chlorine gas), to unscrew the stuck cover cap."
 {¶ 33} Third, he found Hayward's testing of the CL220 negligent, in that test results provided by Hayward during discovery showed that testing of a sealed feeder containing chlorine and water was only performed once. Yano's report stated: "The test was performed for only three weeks * * * and when the test was stopped * * * the *Page 11 
container pressure had already surpassed 70 psi [pounds per square inch] — and was rising rapidly * * *. If the limited Hayward data is extrapolated linearly out in time, the feeder pressure will approach 300 psi after only about 3 months. The normal winter shutdown period for most pools in Ohio is about 6 months. Furthermore, Hayward's pressure tests on other feeders show containers failing at 150 psi * * * and 186 psi * * *. In short, Hayward's own test data indicates that a sealed-up container will reach container burst pressures within the normal winter storage time period. These tests also indicate that Hayward was cognizant of this serious danger i) because of the very fact that they performed the chlorine and water sealed container test, and ii) because they stopped the one test as it approached dangerous internal container pressures."
 {¶ 34} Further testing, the report continued, "would have revealed the design defects in the Hayward feeder, and corrective design actions could have been taken by Hayward. Corrective action could include: i) a stronger (e.g. thicker) plastic cover; ii) a different material for the cover (e.g. less brittle plastic that could withstand tapping); and/or iii) the implementation of a PRV (pressure release valve)."
 {¶ 35} Yano's method of extrapolating a conclusion from Hayward's testing data is not an unsound scientific method. General Elec. Co. v.Joiner (1997), 522 U.S. 136, 146 ("Trained experts commonly extrapolate from existing data."); Larson v. Kempker (C.A. 8, 2005), 414 F.3d 936,941; Asad v. Continental Airlines, Inc. (N.D. Ohio, 2004),314 F.Supp.2d 726, 740. Hayward points to the testimony of its own expert, who pointed out shortfalls in Yano's testimony; specifically, it contends that this method leaves out a *Page 12 
significant variable which undermines the strength of the inferences drawn. The court's role as gatekeeper, however, does not focus upon the conclusions which an expert draws. When a competing expert points out weaknesses in the strength of an expert's conclusion, it does not turn the challenged expert's conclusion into the type of "subjective belief or unsupported speculation" which Daubert prohibits. Daubert,509 U.S. at 590. This manner of extrapolating conclusions from existing data is not the kind of "post hoc, ergo propter hoc" method that we rejected inTerry v. Ottawa Cty. Bd. of Mental Retardation DevelopmentalDelay, 165 Ohio App.3d 638, 2006-Ohio-866, affirmed in part, reversed in part, by Terry v. Caputo, 115 Ohio St.3d 351, 2007-Ohio-5023. A challenged expert's testimony does not have to sustain, at the time of summary judgment, the offering party's burden of proof at trial.Miller v. Bike Athletic Co. (1998), 80 Ohio St. 3d 607, paragraph one of the syllabus. If Yano's method of extrapolating from appellee's testing data omits variables which weaken the strength of his conclusion, as appellee's expert asserts, the trier of fact will be aided by the testimony of both experts to resolve the factual dispute. Appellants' first assignment of error is well-taken.
 {¶ 36} Given that both parties offer competing expert testimony as to whether the chlorinator is defective, summary judgment was improperly granted.
 {¶ 37} The appellate court reviews a grant of summary judgment de novo, standing in the shoes of the trial court. Grafton v. Ohio EdisonCo. (1996), 77 Ohio St.3d 102, 105. Summary judgment may only be granted when there remains no genuine issue of material fact and, when construing the evidence in favor of the nonmoving party, *Page 13 
reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C); Harless v. Willis DayWarehousing Co. (1978), 54 Ohio St.2d 64, 66.
 {¶ 38} The moving party bears the initial burden of demonstrating that there are no genuine issues of material facts regarding an essential element of the nonmoving party's case. Dresher v. Burt (1996),75 Ohio St.3d 280, 292. This burden must be met by specifically referring to the "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any," which affirmatively demonstrate that no material questions of fact remain. Civ.R. 56(C). Once the moving party has met its burden, the nonmoving party then has a corresponding burden to show that there remains a genuine issue of material fact.Dresher, 75 Ohio St.3d at 293; Civ.R. 56(E). The burdens borne by each party may not be met by mere allegations or conclusions, but must be supported by specific facts. Id.
 {¶ 39} Throughout the summary-judgment analysis, all inferences from the "evidence must be strongly construed in favor of the nonmoving party." Ferrando v. Auto-Owners Mut. Ins. Co., 98 Ohio St.3d 186, 190,2002-Ohio-7217. Only if the nonmoving party fails to carry its reciprocal burden may judgment as a matter of law be entered in the moving party's favor.
 {¶ 40} Appellants' complaint stated claims for Hayward's breach of the implied warranty of safety; strict liability, citing Knitz v. MinsterMachine Co. (1982), *Page 14 69 Ohio St.2d 460; negligent design; statutory liability, citing R.C. 2307,71 et. seq.; and requested exemplary and punitive damages, citingLeichtamer v. American Motors Corp. (1981), 67 Ohio St.2d 456, andPreston v. Murty (1987), 32 Ohio St.3d 334.
 {¶ 41} This matter warrants an examination of the evolution of products liability in Ohio, beginning with Lonzrick v. Republic SteelCorp. (1966), 6 Ohio St.2d 227. Lonzrick set forth three common law causes of action for a plaintiff injured by a product: negligence, breach of contract between the parties, and the tort action of breach of the implied warranty of "merchantable quality and fitness." Id. at 230. The defending manufacturer breached the duty when "a defect in the product causes the collapse of the product and is the direct and proximate cause of injury to a person whose presence the defendant could reasonable anticipate." Id. The plaintiff must have proved that the product was defective when the manufacturer sold it, that the defect caused the product to malfunction during its intended purpose, that the defect caused the injury, and that the plaintiff was in a place where the defendant could reasonably anticipate. Id. at 237. The manufacturer could defend on the grounds that the plaintiff assumed the risk or that an intervening cause was present. Id.
 {¶ 42} Next, Temple v. Wean (1977), 50 Ohio St.2d 317, eliminated the distinction between an implied warranty claim in tort and strict liability in tort. The Restatement of the Torts 2d (1965), Section 402(A), became syllabus law: *Page 15 
 {¶ 43} "1. One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 {¶ 44} "(a) the seller is engaged in the business of selling such a product, and
 {¶ 45} "(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 {¶ 46} "2. The rule stated above applies although the seller has exercised all possible care in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller." Id., paragraphs one and two of the syllabus.
 {¶ 47} In Temple, the plaintiff, who had two fingers severed while operating an employer-modified punch press, argued that the punch press was defective because it was unreasonably dangerous and was placed in the hands of users without adequate warning. The court held that the defect arose by virtue of the plaintiffs employer's alteration of the product, not the manufacturer's design. Id. at 325. It recognized, however, the established rule that "a manufacturer or vendor is negligent when he has knowledge of a latent defect rendering a product unsafe and fails to provide a warning of such defect." Id., citingSams v. Englewood Ready-Mix Corp. (1969), 22 Ohio App.2d 168; Burns v.Pennsylvania Rubber Supply Co. (1961), 117 Ohio App. 12. Thus, in a "failure to warn" claim, a manufacturer is negligent for failing to "take precautions that a reasonable *Page 16 
person would take in presenting the product to the public." Crislip v.TCH Liquidating Co. (1990), 52 Ohio St.3d 251, paragraph two of the syllabus.
 {¶ 48} The plaintiff also argued that the punch press was negligently designed because it was not equipped with barrier guards. The court examined the Industrial Commission Safe Code, which provided that punch presses may be made safe by use of either a fixed barrier guard or a two-hand tripping device. Considering this evidence and the fact that the punch press upon which the plaintiff was injured was equipped with a tripping device, the court held that the press was not negligently designed.
 {¶ 49} Then, in Leichtamer v. American Motors Corp. (1981),67 Ohio St.2d 456, a plaintiff injured in a jeep rollover when the rollbar displaced argued that the rollbar was designed with inadequate housing with insufficient strength and support. Expanding the doctrine of strict liability, the court recognized that a "defect may emerge from the mind of the designer as well as from the hand of the workman." Id. at 464. In establishing strict liability for "unreasonably dangerous defective" products, it held that a product is "unreasonably dangerous if it is dangerous to an extent beyond the expectations of an ordinary consumer when used in an intended or reasonably foreseeable manner." Id. at 467. "In order to recover, the plaintiff must prove by a preponderance of the evidence that the `enhancement' of the injuries was proximately caused by a defective product unreasonably dangerous to the plaintiff." Id. This test is also referred to as the "consumer expectations test." *Page 17 
 {¶ 50} The doctrine of strict liability for defective design was clarified further by Knitz v. Minster Machine Co. (1982),69 Ohio St.2d 460, also involving a punch press. Knitz noted that, unlikeLeichtamer, situations arise where "the consumer would not know what to expect, because he would have no idea how safe the product could be made." Id. at 465. The court clarified two tests, the consumer expectations test and the risk-benefit analysis test, either of which can apply in strict liability design defect cases. "A product design is in a defective condition if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risk inherent in such design." Id., syllabus.
 {¶ 51} Following Knitz, in Cremeans v. International HarvesterCo. (1983), 6 Ohio St.3d 232, the court noted that "Knitz sets forth a single, two-pronged test for determining whether a product design is in a defective condition. Under the first prong, commonly referred to as the consumer expectation standard, a defendant will be subject to liability if the plaintiff proves that the product design is in a defective condition because the product fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.
 {¶ 52} "Under the second prong, a defendant will be subject to liability if the plaintiff proves, by using relevant criteria, that the product design is in a defective condition because the benefits of the challenged design do not outweigh the risks inherent in such design. This standard is often referred to as the risk-benefit standard." Id. at 234. *Page 18 
 {¶ 53} Although the test is a "single, two-pronged test," a plaintiff need not prove both but may proceed with one theory. "The test set forth in Knitz does not impose a dual requirement that an injured plaintiff prove that a product design is both in a defective condition and unreasonably dangerous. * * * To require an injured plaintiff to prove both that a product contained a defect and that the defect rendered the product `unreasonably dangerous' would place a greater requirement upon him than required by * * * Lonzrick * * *." Id. (Internal citations omitted.)
 {¶ 54} Knitz and Cremeans "stand for the proposition that a product may be found defective in design under the risk-benefit test where the manufacturer fails to incorporate feasible safety features to prevent harm caused by foreseeable human error." Perkins v. Wilkinson Sword,Inc. (1998), 83 Ohio St.3d 507, 511. A product does not, therefore, have to malfunction in order for a design defect to exist. Id. Knitz also dispensed with Leichtamer's rule requiring a plaintiff in a strict liability case to prove that a product's design is unreasonably dangerous. Id. at 512.
 {¶ 55} Then, pursuing "tort reform," the Ohio Legislature passed the Ohio Products Liability Act, which codified the above tests. R.C.2307.71 et seq. Perkins also held that, under both case law and the new statutory scheme, the consumer expectations test and the risk-benefit analysis test survive and "a manufacturer may be liable for failing to use a feasible alternative design that would have prevented harm caused by an unintended but reasonably foreseeable use of its product." Id. at 513. *Page 19 
 {¶ 56} We dispense with Hayward's statement (adopted by the trial court) that the statutory provisions which now govern product liability law abrogate all common law product liability causes of action, citing R.C. 2307.71(B). That section was added by S.B. 80, and was not effective until April 7, 2005. The instant cause of action arose on June 1, 2003, when appellants were injured. Therefore, the state of products liability law as of the date the cause of action arose applies.
 {¶ 57} Addressing just such a question, the Ohio Supreme Court held that, unless the General Assembly expressly intended statutory products liability law to supplant the common law, the common law remains in full effect. Carrel v. Allied Products Corp. (1997), 78 Ohio St.3d 284, paragraph one of the syllabus; id. at 287. Thus, appellants' common law claims for strict liability and negligent product design ("complementary but distinct" claims) survive despite the subsequent enactment of S.B. 80. Id.
 {¶ 58} Reviewing the claims asserted in appellants' complaint, we note that the separately stated claims for breach of the implied warranty of safety and the claim of strict liability allowed by Knitz are identical and therefore merge. See Temple v. Wean, supra. Therefore, appellants' claims are threefold.
 {¶ 59} First, appellants have a claim that Hayward is strictly liable pursuant to the risk-benefit analysis test codified in R.C. 2307.75. Case law developing the risk-benefit analysis-test should guide in applying the statutory factors.
 {¶ 60} Second, appellants' common law claim for negligent design survives the Products Liability Act. City of Cincinnati v. Beretta U.S.Corp., 95 Ohio St.3d 416, 424, *Page 20 2002-Ohio-2480, ¶ 31. "At common law, a product is defective in design `if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risk inherent in such design.'" Id., citing Knitz v. Minster Machine Co., 69 Ohio St.2d at syllabus. "Moreover, a product may be defective in design if the manufacturer fails to incorporate feasible safety features to prevent foreseeable injuries." Id., citing Perkins v. Wilkinson Sword,Inc., 83 Ohio St.3d at 511.[1]
 {¶ 61} Third, appellants can proceed with their common-law failure to warn claim. "To recover under a failure-to-warn theory at common law, the plaintiff must prove that the manufacturer knew or should have known, in the exercise of reasonable care, of the risk or hazard about which it failed to warn and that the manufacturer failed to take precautions that a reasonable person would take in presenting the product to the public." Id. at ¶ 33, citing Crislip v. TCH LiquidatingCo. (1990), 52 Ohio St.3d 251, 257.
 {¶ 62} The common-law claim for failure to warn was codified by R.C.2307.76, which relevantly provides:
 {¶ 63} "(A) Subject to divisions (B) and (C) of this section, a product is defective due to inadequate warning or instruction if either of the following applies:
 {¶ 64} "(1) It is defective due to inadequate warning or instruction at the time of marketing if, when it left the control of its manufacturer, both of the following applied: *Page 21 
 {¶ 65} "(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
 {¶ 66} "(b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.
 {¶ 67} "(2) It is defective due to inadequate post-marketing warning or instruction if, at a relevant time after it left the control of its manufacturer, both of the following applied:
 {¶ 68} "(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
 {¶ 69} "(b) The manufacturer failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm. *Page 22 
 {¶ 70} "(B) A product is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge."[2]
 {¶ 71} Appellants also requested punitive damages. R.C. 2307.80
provides for punitive damages if a plaintiff establishes statutory liability when "the result of misconduct of the manufacturer or supplier in question that manifested a flagrant disregard of the safety of persons who might be harmed by the product in question."[3] The common law of product liability also provided for punitive damages. "Punitive damages in this state are available upon a finding of actual malice. `Actual malice' for these purposes is `(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" Calmes v. Goodyear Tire Rubber Co. (1991),61 Ohio St.3d 470, 473, quoting Preston v. Murty (1987), 32 Ohio St.3d 334, syllabus. Because both are only determined if and after a plaintiff has proven liability, the question of whether the issue of punitive damages reaches a jury is not properly disposed of where a genuine issue of material fact exists at the summary judgment stage.
 {¶ 72} The defenses available to Hayward include assumption of the risk and unforeseeable misuse. "[T[he voluntary and unreasonable assumption of a known risk *Page 23 
can act as an absolute bar to recovery products liability action."Evanoff v. Grove Mfg. Co. (1994), 99 Ohio App.3d 339, 342, citingOnderko v. Richmond Mfg. Co. (1987), 31 Ohio St.3d 296, syllabus. "For the defense of assumption of the risk to act as a bar to recovery of damages, the defendant must establish that the plaintiff knew of the condition, that the condition was patently dangerous, and that the plaintiff voluntarily exposed himself or herself to the condition. Ordinarily, assumption of the risk is a question of fact, to be resolved by the factfinder." Carrel v. Allied Products Corp.,78 Ohio St.3d at 289, citing Goodin v. Corry (1982), 5 Ohio App.3d 178; Sapp v. StonyRidge Truck Tire (1993), 86 Ohio App.3d 85, 97.
 {¶ 73} As for whether a plaintiffs misuse of a product was foreseeable, "failure to design a product to prevent a foreseeable misuse can be a design defect." Welch Sand Gravel, Inc. v. O KTrojan, Inc. (1995), 107 Ohio App.3d 218, 224, citing Menifee v. OhioWelding Products, Inc. (1984), 15 Ohio St.3d 75.
 {¶ 74} The principles of comparative negligence and comparative fault do not apply to the strict liability claim. Bowling v. Heil Co. (1987),31 Ohio St.3d 277, paragraph one of the syllabus; Onderko v. RichmondMfg. Co., 31 Ohio St.3d at 299. However, since the separate negligence claim may also be submitted to the jury, the traditional defenses to negligence claims may be asserted. Id. at 301.
 {¶ 75} Hayward's arguments depend in part upon assertions that appellants' misuse was unreasonable. Specifically, it notes its expert's report that, in order for this accident to occur, appellants had to ignore the owner manual's instructions to remove chlorine *Page 24 
tablets from the chlorinator before winterizing it; ignore the owner manual's instructions to screw the cap one and a half turns shut when winterizing; close the water intake and outtake valves with a single tube to create a closed system; and then, when de-winterizing, hit the cap with a hammer to open it. However "unreasonable" appellants' actions may have been, their claim does not fail unless the misuse was unforeseeable. "[U]nreasonable misuse is not even a defense to a strict liability claim. * * * [T]wo affirmative defenses exist to a products liability case based upon strict liability in tort: assumption of the risk and unforeseeable misuse of product. `Unforeseeable' and `unreasonable' are not synonyms. Therefore, unreasonable misuse is not a defense to a strict liability defective product claim." Calmes v.Goodyear Tire Rubber Co. (1991), 61 Ohio St.3d 470, 476.
 {¶ 76} Appellants' expert, Yano, offered two safety measures Hayward could have incorporated into its chlorinator in order to prevent post-winterizing explosions from pressurized chlorine gas: a pressure-release valve and a dedicated opening tool. Other evidence, such as the chlorinator patent and other models of chlorinators incorporating these safety devices, are relevant to and supportive of this point. This evidence creates genuine issues of fact as to whether the benefits of the chlorinator's design outweigh the risks. Appellants also presented evidence that their use of the chlorinator was foreseeable because Hayward performed internal pressure testing using water and chlorine inside a sealed unit and stopped the test before burst pressures were reached. Genuine issues of fact remain as to whether failing to completely rinse the unit and sealing it completely *Page 25 
before winterizing was reasonably foreseeable, and, if so, whether the risk of explosion when de-winterizing was more dangerous than the ordinary consumer would expect. A genuine issue of material fact also exists with respect to Hayward's alleged failure to warn; although the owner manual instructs users to clean chlorine residue from the unit and tighten the cap halfway, there is no indication in the owner manual that failing to do so may cause an explosion come springtime. Competing evidence was produced as to the feasibility and reasonableness of placing such warnings on the chlorinator itself versus the owner manual.
 {¶ 77} Hayward also argues that appellants' misuse of the chlorinator was not foreseeable because its expert testified that this accident was the first of its kind reported to Hayward and the first of its kind its expert had encountered. Be that as it may, if Hayward's argument were correct, then any time a product's defectiveness was discovered through an accident the first claim would be barred because it would be the first time the manufacturer had encountered it. Precedent provides that Hayward may introduce evidence that it has no knowledge of similar accidents, if a sufficient foundation is laid at trial. Blanton v.Internatl. Minerals and Chem. Corp. (1997), 125 Ohio App.3d 22, 30-31, citing, inter alia, Knitz v. Minster Machine Co. (Feb. 9, 1987), 6th Dist. No. L-84-125 (following remand in Knitz, 69 Ohio St.2d 460).
 {¶ 78} As the testimony of both parties' experts creates genuine issues of material fact regarding each of appellants' three claims, summary judgment was improper. Appellants' second assignment of error is well-taken. *Page 26 
 {¶ 79} The judgment of the Lucas County Court of Common Pleas is reversed and this matter remanded for further proceedings. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J. Arlene Singer, J., William J. Skow, J. CONCUR.
[1] Since the common-law "consumer expectation test" codified in R.C.2307.75(A)(2) was stricken from the Ohio Products Liability Act by S.B. 80, the inclusion of R.C. 2307.71(B) abrogates the use of that common-law test for claims arising after April 7, 2005.
[2] Again, however, since appellants' claim arose before the enactment of R.C. 2307.71(B), either the statutory framework or the common-law analysis may apply.
[3] R.C. 2307.80(D) was also added by S.B. 80 and does not apply in the event punitive damages become an issue. *Page 1